| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: _____ |

EMMIS COMMUNICATIONS CORPORATION, )
)
    Plaintiff, )
)
    vs. )
)
ADVENT CAPITAL MANAGEMENT, L.L.C., )
OPPENHEIMERFUNDS, INC., FROLEY, REVY )
INVESTMENT COMPANY INC., MERRILL LYNCH )
INVESTMENT MANAGERS (NJ), NUVEEN ASSET )
MANAGEMENT, PUTNAM INVESTMENT )
MANAGEMENT, L.L.C., SHENKMAN CAPITAL )
MANAGEMENT, INC., OAKTREE CAPITAL )
MANAGEMENT, LLC, GABELLI ASSET )
MANAGEMENT COMPANY, FIDELITY )
MANAGEMENT & RESEARCH COMPANY A/K/A )
FMR CORP., DAVIS/DINSMORE MANAGEMENT )
COMPANY, GABELLI ASSET MANAGEMENT )
(UK) LTD., LORD, ABBETT & CO. LLC, )
DEUTSCHE ASSET MANAGEMENT AMERICAS, )
INC., ING INVESTMENTS, LLC (ARIZONA), ING )
INVESTMENT MANAGEMENT CO. (CT), SG )
COWEN & CO., LLC, TEALWOOD ASSET )
MANAGEMENT, INC., SMC CAPITAL, INC., )
MORGAN STANLEY INVESTMENT )
MANAGEMENT INC. (US), PENN CAPITAL )
MANAGEMENT, INC., BLACKROCK FINANCIAL )
MANAGEMENT (VALUE), MFC GLOBAL )
INVESTMENT MANAGEMENT, ST. PAUL )
TRAVELERS COMPANIES, INC., WELLS FARGO )
BANK, N.A., PEKIN SINGER STRAUSS ASSET )
MANAGEMENT INC., )
)
    Defendants. )

[FILED stamp: MAY 16 2005, CLERK OF THE MARION CIRCUIT COURT, 4900310505PL0 18784]

## COMPLAINT

Plaintiff Emmis Communications Corporation ("Emmis"), by its undersigned attorneys, alleges for its Complaint against the defendants as follows:

## Introduction

1. This is an action by Emmis, an Indiana corporation whose stock trades on NASDAQ, seeking reformation of its Articles of Incorporation and declaratory relief to correct a manifest mistake in its Articles of Incorporation.

2. On October 26, 1999, Emmis commenced an offering of 2,500,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock (the "Preferred"). In connection with that offering, Emmis amended and restated its Articles of Incorporation to state the rights and other terms associated with the Preferred.

3. Everyone involved in the offering – Emmis, the underwriter and counsel for both – understood and intended that the Preferred would carry antidilution rights, *i.e.*, provisions that adjust the number of shares of common stock received for each share of Preferred upon conversion, to protect the economic interests of holders of the Preferred in the event of certain actions by Emmis that would otherwise benefit holders of Emmis's common stock at the expense of the Preferred, such as certain dividends, stock splits, issuance of options or warrants, and tenders offers by Emmis for its own common stock (a "self tender"). It was understood and intended that these provisions would operate to keep the economic position of holders of the Preferred substantially the same after any such event as before.

4. Emmis has now discovered, however, that the antidilution provisions of its Second Amended and Restated Articles of Incorporation contain a mistake. Specifically, while the antidilution provisions generally operate as the parties intended – to keep the economic position of holders of the Preferred substantially the same after a triggering event as before – the provision relating to self-tenders produces enormous

adjustments, wildly out of proportion to the effect of any self-tender on the economic position of holders of the Preferred.

5. No one involved in negotiating the terms of the Preferred understood or intended that any provision would make holders of the Preferred better off in the event of a self-tender – or any other triggering event – than they would otherwise be. Everyone involved understood and intended that the antidilution provisions would provide protection for holders of the Preferred in the event of a self-tender, as in the case of the other transactions covered by those provisions – not that there would be any extraordinary or disproportionate benefit to the Preferred in the event of a self-tender. The lead banker at the underwriter, Donaldson Lufkin & Jenrette Securities Corp. ("DLJ"), underwriter's counsel and Emmis's counsel in the Preferred offering have all stated that this provision was a mistake.

6. Indeed, the provision as written produces results that *could not* have been rationally intended, such as a potentially enormous increase in the share of equity held by holders of the Preferred, even where there is no plausible reason for an anti-dilution adjustment at all: in the case of a self-tender *below market price* – which *increases* the share of equity held by the Preferred without any adjustment.

7. Moreover, every other portion of the antidilution adjustment provisions – relating to stock dividends, rights and warrants, stock splits and cash dividends, among other things – produces adjustments that are proportionate to the benefit received by holders of the Common Stock. There is no reason why the provision relating to self-tenders would be so out-of-step with the rest of the conversion provisions – other than a mistake.

8. This mistake is of immediate concern – and in fact came to light – because Emmis has today commenced a self-tender to purchase up to 20,250,000 shares – 40 percent – of its Common Stock, which trades on NASDAQ, at a substantial premium over its recent market price (the "Tender Offer"). If the mistake is not corrected, completion of the Tender Offer could give holders of the Preferred the right to convert each share of Preferred into **more than 19 shares** of common stock – as compared with 1.28 shares of common per share of Preferred before the Tender Offer; holders of the Preferred would then own **61 percent** of the equity of Emmis, rather than the 5.9 percent they now own – without making any additional investment whatsoever.

9. Under those conditions Emmis would be unable to complete the Tender Offer as originally announced. Rather, Emmis would be forced to reduce the Tender Offer to less than 15 percent of its common stock, in which case the antidilution provision will not apply. The opportunity for shareholders to sell their Emmis stock at a substantial premium over its market price would be very substantially diminished. Emmis needs to know whether it can complete its Tender Offer as announced or must proceed on a very reduced scale.

**Parties**

10. Emmis is a corporation organized under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana. Emmis is a diversified media firm with radio broadcasting, television broadcasting and magazine publishing operations.

11. Defendant Advent Capital Management, LLC, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

4

12. Defendant OppenheimerFunds Inc. a corporation organized under the laws of the State of Colorado, with its principal place of business in New York, New York.

13. Defendant Froley Revy Investments Co., Inc., is a corporation organized under the laws of the State of California, with its principal place of business in Los Angeles, California.

14. Defendant Merrill Lynch Investment Managers, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in Plainsboro, New Jersey.

15. Defendant Nuveen Asset Management Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

16. Defendant Putnam Investment Management LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts.

17. Defendant Shenkman Capital Management, Inc. is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.

18. Defendant Oaktree Capital Management, LLC, is a limited liability company organized under the laws of the State of California, with its principal place of business in Los Angeles, California.

19. Defendant Gabelli Asset Management Company d/b/a, Gamco Investors Inc. is a corporation organized under the laws of the State of New York, with its principal place of business in Rye, New York.

20. Defendant Fidelity Management & Research Company a/k/a FMR Corp. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts.

21. Defendant Davis-Dinsmore Management Co. is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Morristown, New Jersey.

22. Defendant Gabelli Asset Management (UK) Ltd., is organized under the laws of the United Kingdom and has its principal place of business in London, England.

23. Defendant Lord Abbett & Co. LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.

24. Defendant Deutsche Asset Management Americas, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

25. Defendant ING Investments, LLC, is a limited liability company organized under the laws of the State of Arizona, with its principal place of business in Scott dale, Arizona.

26. Defendant ING Investment Management Co. is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Hartford, Connecticut.

27. Defendant SG Cowen & Co., LLC, is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.

28. Defendant Tealwood Asset Management, Inc. is a corporation organized under the laws of Minnesota, with its principal place of business in Minneapolis, Minnesota.

29. Defendant SMC Capital, Inc., is a corporation organized under the laws of Kentucky, with its principal place of business in Louisville, Kentucky.

30. Defendant Morgan Stanley Investment Management Inc. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

31. Defendant Penn Capital Management Company, Inc., is a corporation organized under the laws of New Jersey, with its principal place of business in Cherry Hill, New Jersey.

32. Defendant Blackrock Financial Management Inc. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

33. Defendant MFC Global Investment Management Inc. is a corporation organized under the laws of Canada, with its principal place of business in Toronto, Ontario.

34. Defendant St. Paul Travelers Companies, Inc. is a corporation organized under the laws of Minnesota, with its principal place of business in St. Paul, Minnesota.

35. Defendant Wells Fargo Bank, N.A. is a federally chartered banking institution, organized as a national banking association under the laws of the United States, with its principal place of business in San Francisco, California.

36. Defendant Pekin Singer Strauss Asset Management, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in Chicago, Illinois.

37. Upon information and belief, all of the defendants are holders of the Preferred. Upon information and belief, the defendants collectively own more than 75 percent of the outstanding shares of the Preferred.

### Jurisdiction and Venue

38. This Court, as a court of original jurisdiction in civil cases, has jurisdiction of this action pursuant to Ind. Code §§ 33-28-1-2 and 33-29-1-4. In addition, the Court has the power to issue a declaratory judgment pursuant to Ind. Code § 34-14-1 *et. seq.*

39. Venue is proper in this Court pursuant to Rule 75 of the Indiana Rules of Trial Procedure.

### The Mistake

40. On October 26, 1999, Emmis issued a Prospectus and offered for sale 2,500,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock, with a liquidation preference of $50 per share and an initial Conversion Price of $78.125 per share. As a result, each share of Preferred was initially convertible into 0.64 shares of Class A Common Stock ($50 ÷ $78.125). The Prospectus, containing a general description of the antidilution provisions, was distributed to potential purchasers. The detailed terms of the Preferred, including the details of the antidilution provisions, were set forth as Exhibit

A to the Second Amended and Restated Articles of Incorporation of Emmis (the "Preferred Amendment"), which was not distributed to potential purchasers The Preferred Amendment was filed with the Securities and Exchange Commission as an after the offering was marketed.

      41.    Among other things, the Preferred Amendment provides in Section 9 that the Conversion Price "shall be subject to adjustment" in the event of certain actions by Emmis that, absent any adjustment, would dilute the ownership interest in Emmis held by holders of the Preferred. For example, Section 9(c)(i) provided for an adjustment in the event Emmis "shall . . . make a redemption payment or pay a dividend or make another distribution payable in shares of the Corporation's Common Stock to all holders of any class of the Corporation's capital stock." In such a case, the conversion price was to be adjusted so that, upon conversion, a share of Preferred would entitle the holder to receive the number of shares of common stock he or she would have received if the Preferred had been converted before the Redemption payment, dividend or other distribution and the holder had participated at that time. As set forth in the Preferred Amendment, in the event of such a redemption payment, dividend or distribution:

> the Conversion Price in effect immediately prior to such event shall be adjusted . . . so that the holder of any share of Preferred Stock thereafter surrendered for conversion shall be entitled to receive the number of shares of Class A Common Stock that such holder would have owned or would have been entitled to receive upon or by reason of any of the events described above, had such share of Preferred Stock been converted into shares of Class A Common Stock immediately prior to the occurrence of such event.

Section 9(c)(iii) provides a similar adjustment in the event of a stock split or reverse stock split: if Emmis "shall . . . subdivide the outstanding shares of Common Stock into a larger number of shares, combine the outstanding shares of Common Stock into a smaller

9

number of shares or issue any shares of its capital stock in a reclassification of the Common Stock."

42. Section 9(c)(v) provides for an adjustment in the event Emmis makes a cash distribution, "a distribution to all holders of shares of its Common Stock consisting exclusively of cash," under certain circumstances. In that event, the conversion price is adjusted by dividing the pre-distribution conversion price by a fraction in which:

(a) the numerator is "the Market Value as of the record date . . ."; and

(b) the denominator is "the Market Value less the fair market value" of the distribution received, but may not be less than 1.

43. This adjustment operates to keep the economic interests of the preferred substantially the same after payment of a cash distribution to holders of Emmis's common stock, as follows:

(a) The current conversion price of the Preferred is $39.0625 (previously adjusted from $78.125 following a two-for-one stock split pursuant to Section 9(c)(ii)). Thus, upon conversion, holders of the Preferred would be entitled to receive 1.28 shares of common stock ($50 ÷ $39.0625) for each share of Preferred, and all holders of the Preferred combined would own 3,680,000 shares of common stock (1.28 × 2,875,000 shares of Preferred outstanding), equal to 6.1 percent of the 60,498,766 shares of common stock outstanding after the conversion (56,818,766 shares of Class A and Class B common stock currently outstanding + 3,680,000 new shares issued in the conversion).

(b) If, for example, Emmis paid a dividend to holders of common stock of $4.30 per share, the adjustment under Section 9(c)(v) would be as

follows, assuming a Market Value (average closing price for the last 10 days) of $15.45 per share (the closing price of Emmis common stock on the last trading day before announcement of the Tender Offer):

$39.0625 [Pre-Distribution Conversion Price]

÷

($15.45 [Market Value] ÷ ($15.45 [Market Value] − $4.30 [Dividend]))

=   ($39.0625 ÷ ($15.45 ÷ $11.15)

=   ($39.0625 ÷ 1.386)

=   $28.18

(c)     Thus, each share of Preferred, previously convertible into 1.28 shares of common at a $39.0625 conversion price ($50 ÷ $39.0625), would now be convertible into 1.774 shares ($50.00 ÷ $28.18), and all holders of the Preferred combined would own 5,100,250 shares of common stock (1.774 × 2,875,000 shares of Preferred outstanding), equal to 8.2 percent of the 61,919,016 shares of common stock outstanding after the conversion (56,818,766 shares of common currently outstanding + 5,100,250 new shares issued in the conversion). This increase would put holders of the Preferred in substantially the same economic position as before the cash distribution, compensating them for the decline in value of each share of common stock resulting from (a) the payment of cash in the dividend and (b) the increase in the total number of shares of common stock outstanding following conversion.

44.     The mistake at issue here consisted of the inclusion in Section 9(c)(v), relating to cash distributions, of additional language applying the same formula to

completion of "a tender or exchange offer which the Corporation or any of its subsidiaries makes for shares of the Corporations Common Stock," if the value of the offer exceeds 15 percent of Emmis's market capitalization. Under this provision, if applied as written, a tender offer at $19.75 a share for 20,250,000 shares of common stock (the maximum price and shares to be purchased in the Tender Offer, as described below), the following would result:

$$\$39.0625 \text{ [Pre-Distribution Conversion Price]}$$

$$\div$$

$$(\$15.45 \text{ [Market Value]} \div (\$15.45 \text{ [Market Value]} - \$19.75 \text{ [Tender Offer Payment]}, \text{ but not less than } 1))$$

$$= (\$39.0625 \div (\$15.45 \div 1)$$

$$= (\$39.0625 \div \$15.45)$$

$$= \$2.53$$

45.  Thus, each share of Preferred, previously convertible into 1.28 shares of common at a $39.0625 conversion price ($50 ÷ $39.0625), would now be convertible into **19.76** shares ($50.00 ÷ $2.53), and all holders of the Preferred combined would own 56,810,000 shares of common stock (19.76 × 2,875,000 shares of Preferred outstanding), equal to **60.8 percent** of the 93,378,766 shares of common stock outstanding after the conversion (56,818,766 shares of common currently outstanding – 20,250,000 shares purchased in the Tender Offer + 56,810,000 new shares issued in the conversion). Far from preserving the pre-Tender Offer economic position of holders of the Preferred, this would multiply their interest by a factor of **more than 5 times** (taking into account the

decline on value per share of common stock resulting from the payment for shares in the Tender Offer.

46.     This anomaly alone establishes that application to the Tender Offer of the adjustment formula for cash distributions was never intended, and could not have been intended. But the anomalies do not end there. If the formula were applied as written, it could produce an enormous increase in the equity interest of the Preferred, and dilute the holders of Common Stock down to virtually nothing, even if a tender offer were complete at a below-market price – if Emmis repurchased Common Stock at a bargain and thus enhanced the equity of all remaining shares, including the Preferred.

47.     For example, if Emmis completed a tender offer for 20,250,000 shares of its common stock (the number in the Tender Offer) at $15.00, the following adjustment would result, based on the same assumptions as above:

$39.0625 [Pre-Distribution Conversion Price]

$\div$

($15.45 [Market Value] $\div$ ($15.45 [Market Value] – $15.00 [Tender Offer Payment], but not less than 1))

= ($39.0625 $\div$ ($15.45 $\div$ 1)

= ($39.0625 $\div$ $15.45)

= $ 2.53

48.     In these circumstances, the economic interests of holders of the Preferred would multiply by a factor of **6.5 times** – more than in the above-market Tender Offer – even though they suffered no dilution, but actually benefitted as a result of the below-market tender offer itself.

49. All of the other provisions relating to the antidilution adjustment produce adjustments proportional to the triggering transaction. Only the inclusion of tender offers in the provision relating to cash distributions produces results so out of step with any plausible intent of the parties.

50. Everyone involved in negotiating the terms of the Preferred understood and intended that the antidilution provisions would be designed to protect the economic interests of holders of the Preferred – to ensure that those interests would not be impaired – in the event of specified actions by Emmis that would otherwise benefit holders of Emmis's common stock at the expense of the Preferred. None of those involved understood or intended that any provision in the terms of the Preferred would make holders of the Preferred better off in the event of any of these actions than they would otherwise be. None of those involved understood or intended that there would be any extraordinary or disproportionate benefit to the Preferred in the event of a self-tender.

51. None of those involved in negotiating and implementing the Preferred offering had any discussion suggesting that any provision in the terms of the Preferred would or should benefit holders of the Preferred in the event of a self-tender, beyond making them whole for the impairment to their economic interest that a self-tender would otherwise create.

52. The adjustment provision relating to self-tenders was a mutual mistake. Upon information and belief, no purchaser of the Preferred relied on that provision in any transaction. Moreover, any such reliance could not have ben reasonable, given the manifest error in that provision, evidenced by the irrational results it produces.

53. Accordingly, on May 16, 2005, Emmis delivered to the Secretary of State of Indiana, and the Secretary of State accepted for filing, Articles of Correction pursuant to Ind. Code Ann. § 23-1-18-5(b) (2004), correcting the mistake. As corrected, Section 9(c)(v) reads as follows:

> (v) In case the Corporation shall at any time or from time to time (A) make a distribution to all holders of shares of its Common Stock consisting exclusively of cash (excluding any cash portion of distributions referred to in paragraph (iv) above, or cash distributed upon a merger or consolidation to which (B) of this paragraph below applies), that, when combined together with (x) all other such all-cash distributions made within the then-preceding 12 months in respect of which no adjustment has been made and (y) any cash and the fair market value of any other consideration paid or payable in respect of any tender offer by the Corporation or any of its subsidiaries for shares of Common Stock concluded within the then-preceding 12 months in respect of which no adjustment pursuant to this Section 9(c) has been made, in the aggregate exceeds 15% of the Corporation's Market Capitalization as of the record date of such distribution; (B) complete a tender or exchange offer which the Corporation or any of its subsidiaries makes for shares of the Corporation's Common Stock that involves an aggregate consideration that, together with (x) any cash and other consideration payable in a tender or exchange offer by the Corporation or any of its subsidiaries for shares of the Corporation's Common Stock expiring within the then preceding 12 months in respect of which no adjustment has been made and (y) the aggregate amount of any such all-cash distributions referred to in (A) of this paragraph to all holders of shares of Common Stock within the then preceding 12 months in respect of which no adjustments have been made, exceeds 15% of the Corporation's Market Capitalization just prior to the expiration of such tender offer (the "Expiration Time"); or (C) make a distribution to all holders of its Common Stock consisting of evidences of indebtedness, shares of its capital stock other than Common Stock or assets (including securities, but excluding those dividends, rights, options, warrants and distributions referred to in this Section 9(c)), then (1) in the case of (A) and (C) above, the Conversion Price then in effect shall be adjusted by dividing the Conversion Price in effect immediately prior to the date of such distribution by a fraction (x) the numerator of which shall be the Market Value as of the record date referred to below and (y) the denominator of which shall be such Market Value less the then fair market value (as determined by the Board of Directors of the Corporation) of the portion of the cash, evidences of indebtedness, securities or other assets so distributed or paid in such tender or exchange offer, for which no adjustment has been made, applicable to one share of Common Stock (but

15

such denominator not to be less than one), and (2) in the case of (B) above, the Conversion Price then in effect shall be adjusted by dividing the Conversion Price in effect immediately prior to the close of business on the date of the Expiration Time by a fraction (x) the numerator of which shall be equal to the product of (a) the Market Value on the date of the Expiration Time and (b) the number of shares of Common Stock outstanding (including any tendered shares) on the date of the Expiration Time less the number of all shares of Common Stock validly tendered, not withdrawn and accepted for payment up to any maximum specified in the terms of the tender offer or exchange offer (such validly tendered shares, up to any such maximum, being referred to as the "Purchased Shares") and (y) the denominator of which shall be equal to (a) the product of (I) the Market Value on the date of the Expiration Time and (II) the number of shares of Common Stock outstanding (including any tendered shares) on the date of the Expiration Time less (b) the fair market value (as determined by the Board of Directors of the Corporation) of the cash, evidences of indebtedness, securities or other assets paid in such in such tender or exchange offer or so distributed for which no adjustment has been made (assuming in the case of any tender offer or exchange offer, the acceptance, up to any maximum specified in the terms of the tender or exchange offer, of Purchased Shares); provided, however, that no adjustment shall be made with respect to any distribution of rights to purchase securities of the Corporation if the holder of shares of Preferred Stock would otherwise be entitled to receive such rights upon Conversion at any time of shares of Preferred Stock into shares of Class A Common Stock unless such rights are subsequently redeemed by the Corporation, in which case such redemption shall be treated for purposes of this Section 9(c)(v) as a dividend on the Common Stock. Such adjustment shall be made whenever any such distribution is made or tender or exchange offer is completed, as the case may be, and shall become effective retroactively to a date immediately following the close of business on the record date for the determination of stockholders entitled to receive such distribution (or in the case of a tender or exchange offer, immediately prior to the opening of business on the day after the Expiration Time).

### The Tender Offer

54.  On May 10, 2005, Emmis issued a press release announcing a tender offer "expected to commence within 7 days." The Tender Offer will be for the purchase of up to 20,250,000 shares of Common Stock and will be in the form of a Dutch Auction: Shareholders will be able to tender some or all of their common shares at any price between $17.25 and $19.75; Emmis will then determine the lowest price within the range at

which it can purchase 20,250,000 shares (or all the Class A common Stock tendered, if less than 20,500,000 shares) and complete the purchase at that price.

55. Emmis has commenced the Tender Offer today, but will not complete the purchases and pay the Common shareholders on these terms if there is any risk whatsoever that the conversion ratio for the Preferred will be affected as drastically as Section 9(c)(v) of the Preferred Amendment unintentionally provides. Accordingly, the tender offer is contingent on Emmis either prevailing in this lawsuit or resolving the subject matter of the lawsuit in a manner satisfactory to it.

56. The Tender Offer is scheduled to expire on June 13, 2005. Prompt resolution is critical to Emmis and its tendering shareholders, if they are to have the opportunity to sell their shares at the offered – above market – prices.

## Count I
## Declaration

57. Emmis repeats and realleges each of paragraphs 1 through 56 as if fully set forth herein.

58. The provision of the Preferred Amendment relating to adjustment of the conversion price of the Preferred in the event of a tender or exchange offer does not reflect the understanding and intent of the parties who negotiated and drafted the Preferred Amendment.

59. The Preferred Amendment was adopted in the mistaken belief, on the part of all concerned, that it contained only customary anti-dilution provisions.

60. The Articles of Correction that Emmis the Indiana Secretary of State accepted for filing on May 16, 2005, accurately embody the intent of the parties with respect to the subject matter thereof.

61. An actual controversy exists between Emmis and the defendants, holders of Emmis Preferred, concerning the effect of the Tender Offer on the Conversion Rights of defendants' shares.

62. A prompt resolution of the controversy is required to prevent serious injury to Emmis and its shareholders.

63. Emmis is entitled to a declaration that (a) the provision in the Preferred Amendment relating to adjustments to the conversion price of the Preferred in the event of a self-tender or self-exchange offer was the result of a mutual mistake; and (b) the Articles of Correction accepted for filing by the Indiana Secretary of State on May 16, 2005 are valid, binding and enforceable against all holders of the Preferred.

### Count II
### Reformation

64. Emmis repeats and realleges each of paragraphs 1 through 63 as if fully set forth herein.

65. The provision of the Preferred Amendment relating to adjustment of the conversion price of the Preferred in the event of a tender or exchange offer does not reflect the understanding of the parties who negotiated and drafted the Preferred Amendment.

66. The Preferred Amendment was adopted in the mistaken belief, on the part of all concerned, that it contained only customary anti-dilution provisions.

Emmis is entitled to reformation of the Preferred Amendment to conform to the Articles of Correction that the Indiana Secretary of State accepted for filing on May 16, 2005.

WHEREFORE, plaintiff Emmis Communications, Inc., hereby prays that the Court enter judgment in plaintiff's favor:

A. Declaring that:

(i) the provision in the Preferred Amendment relating to adjustments to the conversion price of the Preferred in the event of a self-tender or self-exchange offer was the result of a mutual mistake; and

(ii) the Articles of Correction delivered by Emmis to the Indiana Secretary of State for filing on May 16, 2005 are valid, binding and enforceable against all holders of the Preferred;

B. Reforming the Preferred Amendment to conform to the correction set forth in the Articles of Correction accepted for filing by the Indiana Secretary of State for filing on May 16, 2005;

C. Granting such other and further relief as the Court deems just and proper.

*Edward W. Harris III*
Edward W. Harris III, # 7485-49
James A. Strain, # 725-49
Mary T. Doherty, #16692-49

OF COUNSEL:

SOMMER & BARNARD, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Telephone: (317) 713-3500
Fax: (317) 713-3699