| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: 49D01-0505-PL-018784 |

EMMIS COMMUNICATIONS CORPORATION,                         )
                                                         )

       Plaintiff,                                                               )

       vs.                                                                        )

ADVENT CAPITAL MANAGEMENT, L.L.C.,                         )
OPPENHEIMERFUNDS, INC., FROLEY, REVY                      )
INVESTMENT COMPANY INC., MERRILL LYNCH                )
INVESTMENT MANAGERS (NJ), NUVEEN ASSET              )
MANAGEMENT, PUTNAM INVESTMENT                             )
MANAGEMENT, L.L.C., SHENKMAN CAPITAL                    )
MANAGEMENT, INC., OAKTREE CAPITAL                           )
MANAGEMENT, LLC, GABELLI ASSET                                )
MANAGEMENT COMPANY, FIDELITY                                  )
MANAGEMENT & RESEARCH COMPANY A/K/A              )
FMR CORP., DAVIS/DINSMORE MANAGEMENT                )
COMPANY, GABELLI ASSET MANAGEMENT                      )
(UK) LTD., LORD, ABBETT & CO. LLC,                             )
DEUTSCHE ASSET MANAGEMENT AMERICAS,               )
INC., ING INVESTMENTS, LLC (ARIZONA), ING             )
INVESTMENT MANAGEMENT CO. (CT), SG                      )
COWEN & CO., LLC, TEALWOOD ASSET                           )
MANAGEMENT, INC., SMC CAPITAL, INC.,                       )
MORGAN STANLEY INVESTMENT                                      )
MANAGEMENT INC. (US), PENN CAPITAL                         )
MANAGEMENT, INC., BLACKROCK FINANCIAL             )
MANAGEMENT (VALUE), MFC GLOBAL                           )
INVESTMENT MANAGEMENT, ST. PAUL                           )
TRAVELERS COMPANIES, INC., WELLS FARGO              )
BANK, N.A., PEKIN SINGER STRAUSS ASSET                  )
MANAGEMENT INC.,                                                          )
                                                         )

       Defendants.                                                               )

**FILED**

(43)  MAY 1 9 2005

*Tom Cor. Smiller,*
CLERK OF THE
MARION CIRCUIT COURT

## MEMORANDUM OF LAW OF PLAINTIFF EMMIS COMMUNICATIONS CORPORATION IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY

Plaintiff Emmis Communications Corporation. ("Emmis") respectfully submits this memorandum in support of its Motion for Expedited Discovery.

## PRELIMINARY STATEMENT

Three days ago, on May 16, 2005, Emmis commenced a tender offer to purchase up to 20,250,000 shares of its common stock, which trades on NASDAQ, at a substantial premium over its recent market price (the "Tender Offer"). As Emmis has discovered, however, its Articles of Incorporation contain a mistake that – unless it is corrected – could prevent Emmis from completing the Tender Offer on the announced terms, thereby diminishing the opportunity of Emmis shareholders to sell their Emmis stock at a substantial premium over its market price. Expedited discovery is urgently needed, so that this mistake can be corrected conclusively in time to complete the Tender Offer, currently scheduled to expire on June 13, 2005.

The mistake arises from an October 26, 1999, offering by Emmis of 2,500,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock (the "Preferred"). Everyone involved in the offering understood and intended that the Preferred would carry antidilution rights, *i.e.*, provisions that adjust the number of shares of common stock received for each share of Preferred upon conversion, to protect the economic interests of holders of the Preferred in the event of certain actions by Emmis that would otherwise benefit holders of Emmis's common stock at the expense of the Preferred, such as certain dividends, stock splits, issuance of options or warrants, and tenders offers by Emmis for its own common stock (a "self tender"). It was understood and intended that these provisions would operate to keep the economic position of holders of the Preferred substantially the same after any such event as before.

Emmis has now discovered, however, that the antidilution provisions contain a mistake. Specifically, while the antidilution provisions generally operate as the parties intended – to keep the economic position of holders of the Preferred substantially the same after a

1

triggering event as before – the provision relating to self-tenders produces enormous adjustments, wildly out of proportion to the effect of any self-tender on the economic position of holders of the Preferred.

No one involved in negotiating the terms of the Preferred understood or intended that any provision would make holders of the Preferred better off in the event of a self-tender – or any other triggering event – than they would otherwise be. Everyone involved understood and intended that the antidilution provisions would provide protection for holders of the Preferred in the event of a self-tender, as in the case of the other transactions covered by those provisions – not that there would be any extraordinary or disproportionate benefit to the Preferred in the event of a self-tender. Everyone involved in the Preferred offering agrees that this provision was a mistake.

Indeed, the provision as written produces results that *could not* have been rationally intended, such as a potentially enormous increase in the share of equity held by holders of the Preferred, even where there is no plausible reason for an anti-dilution adjustment at all: in the case of a self-tender *below market price* – which *benefits* holders of the Preferred without any adjustment.

Moreover, every other portion of the antidilution adjustment provisions – relating to stock dividends, rights and warrants, stock splits and cash dividends, among other things – produces adjustments that are proportionate to the benefit received by holders of the Common Stock. There is no reason why the provision relating to self-tenders would be so out-of-step with the rest of the conversion provisions – other than a mistake.

It is imperative to correct this mistake promptly. If it is not corrected, completion of the Tender Offer could give holders of the Preferred the right to convert each share of

2

Preferred into **more than 19 shares** of common stock – as compared with 1.28 shares of common per share of Preferred before the Tender Offer; holders of the Preferred would then own **61 percent** of the equity of Emmis, rather than the 6 percent they now own – without making any additional investment whatsoever.

Under those conditions Emmis would be unable to complete the Tender Offer as originally announced. Rather, Emmis would be forced to reduce the Tender Offer to less than 15 percent of its common stock, in which case the antidilution provision will not apply. The opportunity for shareholders to sell their Emmis stock at a substantial premium over its market price would be very substantially diminished. Emmis needs to know whether it can complete its Tender Offer as announced or must proceed on a very reduced scale.

## STATEMENT OF FACTS

### A.    The Mistake

On October 26, 1999, Emmis issued a Prospectus and offered for sale 2,500,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock, with a liquidation preference of $50 per share and an initial Conversion Price of $78.125 per share. (Harris Aff. Ex. 1.). As a result, each share of Preferred was initially convertible into 0.64 shares of Class A Common Stock ($50 ÷ $78.125). (*Id.* at pp. 58-59.) The Prospectus, containing a general description of the antidilution provisions, was distributed to potential purchasers. (*Id.* at pp. 59-61; Greenthal Aff. ¶ 8.) The detailed terms of the Preferred, including the details of the antidilution provisions, were set forth as Exhibit A to the Second Amended and Restated Articles of Incorporation of Emmis (the "Preferred Amendment"), which was not distributed to potential purchasers. (Harris Aff. Ex. 2; Greenthal Aff. ¶ 8.) The Preferred Amendment was filed with the Securities and Exchange Commission after the offering was marketed. Each of the defendants is a holder of the Preferred, and together, defendants are believed to hold more than 80 percent of the Preferred.

3

The Preferred Amendment provides in Section 9 that the Conversion Price "shall

be subject to adjustment" in the event of certain actions by Emmis that, absent any adjustment,

would dilute the ownership interest in Emmis held by holders of the Preferred. (Harris Aff. Ex. 2

§ 9(c).) For example, Section 9(c)(i) provides for an adjustment in the event Emmis "shall . . .

make a redemption payment or pay a dividend or make another distribution payable in shares of

the Corporation's Common Stock to all holders of any class of the Corporation's capital stock."

In such a case, the conversion price was to be adjusted so that, upon conversion, a share of

Preferred would entitle the holder to receive the number of shares of common stock he or she

would have received if the Preferred had been converted before the Redemption payment,

dividend or other distribution and the holder had participated at that time. As set forth in the

Preferred Amendment, in the event of such a redemption payment, dividend or distribution:

> the Conversion Price in effect immediately prior to such event shall be adjusted . .
> . so that the holder of any share of Preferred Stock thereafter surrendered for
> conversion shall be entitled to receive the number of shares of Class A Common
> Stock that such holder would have owned or would have been entitled to receive
> upon or by reason of any of the events described above, had such share of
> Preferred Stock been converted into shares of Class A Common Stock
> immediately prior to the occurrence of such event.

(*Id.* § 9(c)(i).) Section 9(c)(iii) provides a similar adjustment in the event of a stock split or

reverse stock split: if Emmis "shall . . . subdivide the outstanding shares of Common Stock into

a larger number of shares, combine the outstanding shares of Common Stock into a smaller

number of shares or issue any shares of its capital stock in a reclassification of the Common

Stock."

Section 9(c)(v) provides for an adjustment in the event Emmis makes a cash

distribution, "a distribution to all holders of shares of its Common Stock consisting exclusively

of cash," under certain circumstances. In that event, the conversion price is adjusted by dividing
the pre-distribution conversion price by a fraction in which:

      (a)    the numerator is "the Market Value as of the record date . . . "; and

      (b)    the denominator is "the Market Value less the fair market value" of the
distribution received, but may not be less than 1.

           This adjustment operates to keep the economic interests of the preferred
substantially the same after payment of a cash distribution to holders of Emmis's common stock,
as follows:

      (a)    The current conversion price of the Preferred is \$39.0625 (previously
adjusted from \$78.125 following a two-for-one stock split pursuant to Section 9(c)(ii)).
Thus, upon conversion, holders of the Preferred would be entitled to receive 1.28 shares
of common stock (\$50 ÷ \$39.0625) for each share of Preferred, and all holders of the
Preferred combined would own 3,680,000 shares of common stock (1.28 × 2,875,000
shares of Preferred outstanding), equal to 6.1 percent of the 60,498,766 shares of
common stock outstanding after the conversion (56,818,766 shares of Class A and Class
B common stock currently outstanding + 3,680,000 new shares issued in the
conversion).

      (b)    If, for example, Emmis paid a dividend to holders of common stock of
\$4.30 per share, the adjustment under Section 9(c)(v) would be as follows, assuming a
Market Value (average closing price for the last 10 days) of \$15.45 per share (the closing
price of Emmis common stock on the last trading day before announcement of the Tender
Offer):

    \$39.0625 [Pre-Distribution Conversion Price]

    ÷

($15.45 [Market Value] ÷ ($15.45 [Market Value] − $4.30 [Dividend]))

=   ($39.0625 ÷ ($15.45 ÷ $11.15)

=   ($39.0625 ÷ 1.386)

=   $28.18

(c)     Thus, each share of Preferred, previously convertible into 1.28 shares of common at a $39.0625 conversion price ($50 ÷ $39.0625), would now be convertible into 1.774 shares ($50.00 ÷ $28.18), and all holders of the Preferred combined would own 5,100,250 shares of common stock (1.774 × 2,875,000 shares of Preferred outstanding), equal to 8.2 percent of the 61,919,016 shares of common stock outstanding after the conversion (56,818,766 shares of common currently outstanding + 5,100,250 new shares issued in the conversion). This increase would put holders of the Preferred in substantially the same economic position as before the cash distribution, compensating them for the decline in value of each share of common stock resulting from (a) the payment of cash in the dividend and (b) the increase in the total number of shares of common stock outstanding following conversion.

The mistake at issue here consisted of including in Section 9(c)(v), relating to cash and other distributions, additional language applying the same formula to completion of "a tender or exchange offer which the Corporation or any of its subsidiaries makes for shares of the Corporation's Common Stock," if the value of the offer exceeds 15 percent of Emmis's market capitalization. (Harris Aff. Ex. 2 § 9(c)(v).) Under this provision, if applied as written, a tender offer at $19.75 a share for 20,250,000 shares of common stock (the maximum price and shares to be purchased in the Tender Offer, as described below), the following would result:

$39.0625 [Pre-Distribution Conversion Price]

÷

6

($15.45 [Market Value] ÷ ($15.45 [Market Value] − $19.75 [Tender Offer
Payment], but not less than 1))

$$= \quad (\$39.0625 \div (\$15.45 \div 1)$$

$$= \quad (\$39.0625 \div \$15.45)$$

$$= \quad \$2.53$$

Thus, each share of Preferred, previously convertible into 1.28 shares of common at a $39.0625 conversion price ($50 ÷ $39.0625), would now be convertible into **19.76** shares ($50.00 ÷ $2.53), and all holders of the Preferred combined would own 56,810,000 shares of common stock (19.76 × 2,875,000 shares of Preferred outstanding), equal to **60.8 percent** of the 93,378,766 shares of common stock outstanding after the conversion (56,818,766 shares of common currently outstanding − 20,250,000 shares purchased in the Tender Offer + 56,810,000 new shares issued in the conversion). Far from preserving the pre-Tender Offer economic position of holders of the Preferred, this would multiply their interest by a factor of **more than 5 times** (taking into account the decline on value per share of common stock resulting from the payment for shares in the Tender Offer).

This anomaly alone establishes that application to the Tender Offer of the adjustment formula for cash distributions was never intended, and could not have been intended. But the anomalies do not end there. If the formula were applied as written, it could produce an enormous increase in the equity interest of the Preferred, and dilute the holders of Common Stock down to virtually nothing, even if a tender offer were complete at a below-market price − if Emmis repurchased Common Stock at a bargain and thus enhanced the equity of all remaining shares, including the Preferred.

7

For example, if Emmis completed a tender offer for 20,250,000 shares of its common stock (the number in the Tender Offer) at \$15.00, the following adjustment would result, based on the same assumptions as above:

\$39.0625 [Pre-Distribution Conversion Price]

÷

(\$15.45 [Market Value] ÷ (\$15.45 [Market Value] – \$15.00 [Tender Offer Payment], but not less than 1))

= 	($39.0625 ÷ ($15.45 ÷ 1)

= 	($39.0625 ÷ $15.45)

= 	$ 2.53

In these circumstances, the economic interests of holders of the Preferred would multiply by a factor of **6.5 times** – more than in the above-market Tender Offer – even though they suffered no dilution, but actually benefitted as a result of the below-market tender offer itself.

All of the other provisions relating to the antidilution adjustment produce adjustments proportional to the triggering transaction. Only the inclusion of tender offers in the provision relating to cash distributions produces results so out of step with any plausible intent of the parties.

Everyone involved in negotiating the terms of the Preferred understood and intended that the antidilution provisions would be designed to protect the economic interests of holders of the Preferred – to ensure that those interests would not be impaired – in the event of specified actions by Emmis that would otherwise benefit holders of Emmis's common stock at the expense of the Preferred. None of those involved understood or intended that any provision in the terms of the Preferred would make holders of the Preferred better off in the event of any of

8

these actions than they would otherwise be. None of those involved understood or intended that there would be any extraordinary or disproportionate benefit to the Preferred in the event of a self-tender.

None of those involved in negotiating and implementing the Preferred offering had any discussion suggesting that any provision in the terms of the Preferred would or should benefit holders of the Preferred in the event of a self-tender, beyond making them whole for the impairment to their economic interest that a self-tender would otherwise create. As stated in the Affidavit of Jill Greenthal of Donaldson Lufkin & Jenrette Securities Corp., the underwriter of the Preferred:

> I never understood or intended that any provision in the terms of the Preferred would make holders of the Preferred better off in the event of any of these actions than they would otherwise be. I understood and intended that the antidilution provisions would provide protection for holders of the Preferred in the event of a self-tender, as in the case of the other transactions covered by those provisions – not that there would be any extraordinary or disproportionate benefit to the Preferred in the event of a self-tender. This is consistent with my understanding of antidilution provisions in other offerings I have handled over the years.

(Greenthal Aff. ¶ 5.) Emmis' representatives involved in designing the terms of the Preferred agree, and there was no discussion or negotiation suggesting that "any provision in the terms of the Preferred would or should benefit holders of the Preferred in the event of a self-tender, beyond making them whole for the impairment to their economic interest that a self-tender would otherwise create." (*Id.* ¶ 6; Smulyan Aff. ¶ 7.)

The adjustment provision relating to self-tenders was a mutual mistake. (Greenthal Aff. ¶ 7; Smulyan Aff. ¶ 8.) Upon information and belief, no purchaser of the Preferred relied on that provision in any transaction. (*See* Greenthal Aff. ¶ 8.) Moreover, any

9

such reliance could not have been reasonable, given the manifest error in that provision,

evidenced by the irrational results it produces.

Accordingly, on May 16, 2005, Emmis delivered to the Secretary of State of

Indiana, and the Secretary of State approved and filed, Articles of Correction pursuant to Ind.

Code Ann. § 23-1-18-5(b) (2004), correcting the mistake. As corrected, Section 9(c)(v) reads, in

pertinent part, as follows:

(v) In case the Corporation shall at any time or from time to time ...
(B) complete a tender or exchange offer which the Corporation or any of its
subsidiaries makes for shares of the Corporation's Common Stock that involves
an aggregate consideration that . . . exceeds 15% of the Corporation's Market
Capitalization just prior to the expiration of such tender offer (the "Expiration
Time") . . ., then . . . (2) in the case of (B) above, the Conversion Price then in
effect shall be adjusted by dividing the Conversion Price in effect immediately
prior to the close of business on the date of the Expiration Time by a fraction (x)
the numerator of which shall be equal to the product of (a) the Market Value on
the date of the Expiration Time and (b) the number of shares of Common Stock
outstanding (including any tendered shares) on the date of the Expiration Time
less the number of all shares of Common Stock validly tendered, not withdrawn
and accepted for payment up to any maximum specified in the terms of the tender
offer or exchange offer (such validly tendered shares, up to any such maximum,
being referred to as the "Purchased Shares") and (y) the denominator of which
shall be equal to (a) the product of (I) the Market Value on the date of the
Expiration Time and (II) the number of shares of Common Stock outstanding
(including any tendered shares) on the date of the Expiration Time less (b) the fair
market value (as determined by the Board of Directors of the Corporation) of the
cash, evidences of indebtedness, securities or other assets paid in such in such
tender or exchange offer or so distributed for which no adjustment has been made
(assuming in the case of any tender offer or exchange offer, the acceptance, up to
any maximum specified in the terms of the tender or exchange offer, of Purchased
Shares) . . ..

(Harris Aff. Ex. 3 at Attachment 5.)

**B.    The Tender Offer**

On May 10, 2005, Emmis issued a press release announcing a tender offer

"expected to commence within 7 days." The Tender Offer is for the purchase of up to

20,250,000 shares of Common Stock and is in the form of a Dutch Auction: Shareholders will

10

be able to tender some or all of their common shares at any price between $17.25 and $19.75;
Emmis will then determine the lowest price within the range at which it can purchase 20,250,000
shares (or all the Class A Common Stock tendered, if less than 20,500,000 shares) and complete
the purchase at that price. (Harris Aff. Ex. 4.)

Emmis commenced the Tender Offer on May 16, 2005, but will not complete the
purchases and pay the Common shareholders on these terms if there is any risk whatsoever that
the conversion ratio for the Preferred will be affected as drastically as Section 9(c)(v) of the
Preferred Amendment unintentionally provides. Accordingly, the Tender Offer is contingent on
Emmis either prevailing in this lawsuit or resolving the subject matter of the lawsuit in a manner
satisfactory to it. (Harris Aff. Ex. 5 at cover page and pp. 17-18.)

The Tender Offer is scheduled to expire on June 13, 2005. (*Id.* at p. 3.)

## C. The Present Action

In view of the facts described above, Emmis commenced this Action on May 16,
2005, seeking a judgment:

    (a)    declaring that:

        (i)    the provision in the Preferred Amendment relating to
adjustments to the conversion price of the Preferred in the event of a self-tender or
self-exchange offer was the result of a mutual mistake; and

        (ii)    the Articles of Correction delivered by Emmis to, and
approved and filed by, the Indiana Secretary of State on May 16, 2005 are valid,
binding and enforceable against all holders of the Preferred; and

    (b)    reforming the Preferred Amendment *ab initio* to conform to the correction
set forth in the Articles of Correction.

11

Prompt resolution is critical to Emmis and its tendering shareholders, if they are to have the opportunity to sell their shares at the offered – above market – prices.

## ARGUMENT

The Indiana Rules of Trial Procedure give this Court broad discretion to permit expedited discovery. Rule 30(A) expressly authorizes a plaintiff upon leave of Court—"with or without notice" -- to take deposition testimony prior to the expiration of 20 days after service of the summons and complaint. Similarly, Rules 33(C) and 34(B) permit the Court to "allow" a "shorter . . . time" than 30 days after service for a party to respond to interrogatories and requests for the production of documents. Expedited discovery should be permitted in this case both because the need is urgent and because Emmis's Complaint presents a claim of unquestionable merit that can and should be promptly resolved.

### I.

### THE NEED FOR EXPEDITED DISCOVERY IS URGENT

The normal pace of discovery would be inadequate in this case and would result in prejudice to Emmis and its shareholders. Emmis has just commenced a self-tender to purchase at a substantial premium over its recent market price up to 20,250,000 shares, or 40 percent, of its Common Stock, which trades on NASDAQ (the "Tender Offer"). As described above, however, the mistake in Emmis's Articles of Incorporation, in the unlikely event holders of Preferred successfully challenge the Articles of Correction, would produce such enormously disastrous results upon completion of the Tender Offer – giving holders of Emmis's Preferred the ability to control more than 60% of Emmis's equity, as opposed to the six percent (6%) they control now – that Emmis will not be able to complete the Tender Offer on the announced terms. Thus unless the mistake is corrected before completion of the Tender Offer, Emmis will be forced to reduce the Tender Offer to less than 15 percent of its Common Stock, in which case the

12

antidilution provision containing the mistake will not apply. The opportunity for shareholders to

sell their Emmis Common Stock at a substantial premium over its market price will be very

substantially diminished. Emmis needs to know whether it can complete its Tender Offer as

announced or must proceed on a very reduced scale.

## II.

### EMMIS'S CLAIMS CAN AND SHOULD BE
### QUICKLY AND EASILY RESOLVED

By this action, Emmis seeks reformation and declaratory relief to bring the

antidilution provisions of its Articles of Incorporation in line with the unanimous intent of the

parties who were involved in designing them. Emmis's claims are manifestly meritorious and

can be resolved quickly.

### A.    Emmis Is Manifestly Entitled to the Declaratory Relief It Seeks

Under Ind. Code § 23-1-18-5(a)(1), a corporation may correct a document filed by

the Secretary of State if the document: "[c]ontains an incorrect statement." The correction is

accomplished by preparing articles of correction that:

(A) Describe the document (including its filing date) or attach a copy of it to the
articles;

(B) Specify the incorrect statement and the reason it is incorrect . . .; and

(C) Correct the incorrect statement . . .."

Ind. Code § 23-1-18-5(b)(1). The articles of correction must be delivered to the Secretary of

State for filing. Ind. Code § 23-1-18-5(b)(2). Articles of correction are effective "on the

effective date of the document they correct except as to persons reasonably relying on the

uncorrected document and adversely affected by the correction." Ind. Code § 23-1-18-5(c).

All of the conditions for valid Articles of Correction, binding on all holders of the

Preferred, are easily established here.

13

*First*, it is beyond serious dispute that the antidilution provision regarding self-tenders is an "incorrect statement." That is evident from the unanimous testimony of those involved in setting the terms of the Preferred – and is also apparent from the face of the provision, which produces incoherent results as written.

*Second*, it is evident from a review of the Articles of Correction that they ("[d]escribe the document (including its filing date)," "[s]pecify the incorrect statement and the reason it is incorrect," and "correct the incorrect statement."

*Third*, it is undisputed that the Articles of Correction have been delivered to the Secretary of State for filing and have been approved and filed by the Secretary of State.

*Fourth*, it is not possible that anyone "reasonably rel[ied]on the uncorrected document," much less that anyone would be "adversely affected by the correction." The "uncorrected document" was never circulated to purchasers of the Preferred – and even if any purchaser of the Preferred saw it and detected and understood the mistaken provision, there could be no *reasonable* reliance because the provision as written produces incoherent results.

Accordingly, Emmis's prayer for a declaration regarding the Articles of Correction can be resolved through prompt and straightforward proceedings in this Court.

## B.   Emmis Is Clearly Entitled to Reformation

Under Indiana law, courts possess equity jurisdiction to reform written documents where there is a mutual mistake, "that is, where there has been a meeting of the minds, an agreement actually entered into, but the document in its written form does not express what the parties actually intended." *Plumlee* v. *Monroe Guaranty Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995); *accord Cerebrus Int'l, Ltd.* v. *Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. Supr. 2002) ("Courts of equity have the power to grant reformation of a contract. The Court of Chancery may use this remedy to reform a contract in order to express the 'real agreement' of

the parties involved."); *Born* v. *Schrenkeisen*, 17 N.E. 339, 341 (N.Y. 1888) ("Where there is no mistake about the agreement, and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.").

"The party seeking reformation must establish the true intentions of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument therefore does not reflect the true intentions of the parties." *Estate of Reasor* v. *Putnam County*, 635 N.E.2d 153, 158 (Ind. 1994). Because "[t]he primary purpose of reformation is to effectuate the common intentions of all parties to an instrument which were incorrectly reduced to writing[,] . . . a grant of reformation is necessarily predicated upon a prior understanding between all parties on essential terms. Otherwise, there would be no standard to which an instrument could be reformed." *Pearson* v. *Winfield*, 313 N.E.2d 95, 99 (Ind. Ct. App. 1974); *accord Miller* v. *Hob Tea Room*, 75 A.2d 577, 580 (Del. Ch. 1950) (same); *Ross* v. *Food Specialties, Inc.*, 189 N.Y.S.2d 857, 859-60 (N.Y. 1959) (same).

There can be no serious question that the requirements for reformation are established here. The Preferred Amendment contains an obvious mistake that fails to reflect the understandings and intentions of the parties with respect to the adjustment of the conversion price for Preferred in the event of a self-tender by Emmis. As demonstrated above, the application to tender offers of the adjustment formula for cash distributions was never intended, and could not ever have been intended, because it produces manifestly unreasonable results. This alone establishes that the application of the cash distribution formula to tender offers was never intended, and could not have been intended. *See, e.g., Levy* v. *315 W. Seventy-Ninth St. Corp.*, 225 N.Y.S. 218, 221 (App. Div. 1st Dep't 1927) (affirming trial court's grant of

15

reformation where the defendant established that the failure of the contract to properly set out the due date of the mortgage was a stenographic error and a mistake of omission, noting that "[w]e do not deem it likely that a lawyer would believe that a mortgage for \$180,000 ran until it was paid off at the rate of \$2,500 every quarter, which would be 18 years, a most unusual term of payment for a mortgage of real property, and one requiring some inquiry as to such term"). *See also Meier* v. *Brooks*, 253 N.Y.S.2d 564, 568 (App. Div. 4th Dep't 1964) ("If the environment and the motive of the parties, the consideration and the necessities to be met, make the contract as it is written a highly improbable one, one for which there was no motive, or necessity, or consideration, then the writing has little self-supporting force, and a relatively small amount of clear and credible evidence will establish the mistake.") (internal quotations and citation omitted).

More to the point, representatives of both sides involved in negotiating the terms of the Preferred have stated under oath that this was a "mistake," and no such provsison – extraordinary as its consequences are – was mentioned anywhere in the Prospectus for the Preferred.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for expedited discovery should be granted.

Edward W. Harris III, # 7485-49
James A. Strain, # 725-49
Mary T. Doherty, #16692-49

Attorneys for Plaintiff
Emmis Communications Corporation

16

OF COUNSEL:
SOMMER & BARNARD, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Telephone: (317) 713-3500
Fax: (317) 713-3699

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing has been served this 19th day of May, 2005, by certified mail/return receipt requested, postage prepaid, upon all defendants at the addresses listed on the summonses to them, as follows:

Merrill Lynch Investment Managers, L.P.
c/o CT Corporation System
111 Eighth avenue
New York, NY 10011

Blackrock Financial Management, Inc.
Attn: Highest Office Found
40 East 52nd Street
New York, NY 10022

Pekin Singer & Strass Asset Management,
Inc.
Attn: Highest Officer Found
311 S. Wacker Dr., #4990
Chicago, IL 60606-6622

The St. Paul Travelers Companies, Inc.
Attn: Highest Officer Found
385 Washington Street
St. Paul, MN 55102-1309

Advent Capital Management, LLC
Attn: Highest Officer Found
1065 Avenue of the Americas
31st Floor
New York, NY 10018

Deutsche Asset Management Americas, Inc.
Attn: Highest Officer Found
222 Riverside Plaza
Chicago, IL 60606-5808

SMC Capital, Inc.
Attn: Highest Officer Found
4350 Brownsboro Road, #310
Louisville, KY 40207

MFS Global Investment Management,
Inc.
Attn: Highest Officer Found
200 Clarendon Street, T-58
Boston, MA 02117

Wells Fargo Bank, N.A.
Attn: Highest Officer Found
420 Montgomery Street
San Francisco, CA 94104-1205

Morgan Stanley Investment Management,
Inc.
Attn: Highest Officer Found
1221 6th Avenue
New York, NY 10020

Davis-Dinsmore Management Company
Attn: Highest Officer Found
65 Madison Avenue, 4th Floor
Morristown, NJ 07960

Fidelity Management & Research
Company
Attn: Highest Officer Found
82 Devonshire Street
Boston, MA 02109

Froley, Revy Investment Co., Inc.
Attn: Highest Officer Found
10900 Wilshire Blvd., #900
Los Angeles, CA 90024
Gabelli Asset Management UK LTD.
Attn: Highest Officer Found
5 Princes Gate, London
SW7 1QJ

Lord, Abbett & Co. LLC
Attn: Highest Officer Found
90 Hudson Street
Jersey City, NJ 07302

Oaktree Capital Management, LLC
Attn: Highest Office Found
333 S. Grand Ave., 28th Floor
Los Angeles, CA 90071

Putnam Investment Management LLC
Attn: Highest Officer Found
One Post Office Square
Boston, MA 02109

SC Cowen & Co., LLC
Attn: Highest Officer Found
1221 Avenue of the Americas
New York, NY 10020-1001

ING Investment Management Co.
Attn: Highest Officer Found
230 Park Avenue
New York, NY 10169

Gabelli Asset Management Company
1 Corporate Center
Rye, NY 10580-1422

ING Investments, LLC
Attn: Highest Officer Found
7337 E. Doubletree Ranch Road
Scottsdale, AZ 85258

Nuveen Asset Management
Attn: Highest Officer Found
333 W. Wacker Dr., #3200
Chicago, IL 60606-2290

Oppenheimerfunds, Inc.
Attn: Highest Officer Found
235 Liberty Street, 11th Floor
2 World Financial Center
New York, NY 10281

Shenkman Capital Management, Inc.
Attn: Highest Officer Found
461 Fifth Ave., 22nd Floor
New York, NY 10017

Tealwood Asset Management
Attn: Highest Officer Found
100 South 5th Street, Suite 410
Minneapolis, MN 55402-1229

Penn Capital Management, Inc.
Attn: Highest Officer Found
52 Haddonfield-Berlin Road
Cherry Hill, NJ 08034


Edward W. Harris III

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: 49D01-0505-PL-018784 |

EMMIS COMMUNICATIONS CORPORATION,                )
                                                 )
    Plaintiff,                               )
                                                 )
vs.                                              )
                                                 )
ADVENT CAPITAL MANAGEMENT, L.L.C.,               )
OPPENHEIMERFUNDS, INC., FROLEY, REVY             )
INVESTMENT COMPANY INC., MERRILL LYNCH           )
INVESTMENT MANAGERS (NJ), NUVEEN ASSET           )
MANAGEMENT, PUTNAM INVESTMENT                    )
MANAGEMENT, L.L.C., SHENKMAN CAPITAL             )
MANAGEMENT, INC., OAKTREE CAPITAL                )
MANAGEMENT, LLC, GABELLI ASSET                   )
MANAGEMENT COMPANY, FIDELITY                     )
MANAGEMENT & RESEARCH COMPANY A/K/A              )
FMR CORP., DAVIS/DINSMORE MANAGEMENT             )
COMPANY, GABELLI ASSET MANAGEMENT               )
(UK) LTD., LORD, ABBETT & CO. LLC,               )
DEUTSCHE ASSET MANAGEMENT AMERICAS,              )
INC., ING INVESTMENTS, LLC (ARIZONA), ING        )
INVESTMENT MANAGEMENT CO. (CT), SG               )
COWEN & CO., LLC, TEALWOOD ASSET                 )
MANAGEMENT, INC., SMC CAPITAL, INC.,             )
MORGAN STANLEY INVESTMENT                        )
MANAGEMENT INC. (US), PENN CAPITAL               )
MANAGEMENT, INC., BLACKROCK FINANCIAL            )
MANAGEMENT (VALUE), MFC GLOBAL                   )
INVESTMENT MANAGEMENT, ST. PAUL                  )
TRAVELERS COMPANIES, INC., WELLS FARGO           )
BANK, N.A., PEKIN SINGER STRAUSS ASSET           )
MANAGEMENT INC.,                                 )
                                                 )
    Defendants.                              )

**FILED**

(43)  MAY 1 9 2005

CLERK OF THE
MARION CIRCUIT COURT

## AFFIDAVIT OF EDWARD W. HARRIS III

        I, Edward W. Harris III, affirm under the penalties for perjury that the

following representations are true:

1.    I am a member of the law firm of Sommer & Barnard Attorneys, P.C., attorneys for plaintiff Emmis Communications Corporation ("Emmis") in this action. I am submitting this Affidavit in support of Emmis's Motion for Expedited Discovery, and specifically, to place before the Court certain documents relevant to that motion.

2.    Attached hereto as Exhibit 1 is a copy of the Prospectus issued by Emmis in connection with its October 26, 1999, offering of 2,500,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock (the "Preferred").

3.    Attached hereto as Exhibit 2 is a copy of Exhibit A to the Second Amended and Restated Articles of Incorporation of Emmis.

4.    Attached hereto as Exhibit 3 is a copy of the Articles of Correction that Emmis delivered to the Indiana Secretary of State pursuant to Ind. Code Ann. § 23-1-18-5(b) (2004), and the Secretary of State approved and filed, on May 16, 2005.

5.    Attached hereto as Exhibit 4 is a copy of a press release that Emmis issued on May 10, 2005.

6.    Attached hereto as Exhibit 5 is a copy of the Form TO that Emmis filed with the Securities and Exchange Commission on May 16, 2005.

I affirm under the penalties for perjury that the foregoing representations are true.

Dated:  May 19, 2005

Edward W. Harris III

2

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Affidavit of Edward W.
Harris III has been served this ___19___ day of May, 2005, by certified mail/return
receipt requested, postage prepaid, upon all defendants at the addresses listed on the
summonses to them, as follows:

| | |
|---|---|
| Merrill Lynch Investment Managers, L.P. c/o CT Corporation System 111 Eighth avenue New York, NY 10011 | SMC Capital, Inc. Attn: Highest Officer Found 4350 Brownsboro Road, #310 Louisville, KY 40207 |
| Blackrock Financial Management, Inc. Attn: Highest Office Found 40 East 52nd Street New York, NY 10022 | MFS Global Investment Management, Inc. Attn: Highest Officer Found 200 Clarendon Street, T-58 Boston, MA 02117 |
| Pekin Singer & Strass Asset Management, Inc. Attn: Highest Officer Found 311 S. Wacker Dr., #4990 Chicago, IL 60606-6622 | Wells Fargo Bank, N.A. Attn: Highest Officer Found 420 Montgomery Street San Francisco, CA 94104-1205 |
| The St. Paul Travelers Companies, Inc. Attn: Highest Officer Found 385 Washington Street St. Paul, MN 55102-1309 | Morgan Stanley Investment Management, Inc. Attn: Highest Officer Found 1221 6th Avenue New York, NY 10020 |
| Advent Capital Management, LLC Attn: Highest Officer Found 1065 Avenue of the Americas 31st Floor New York, NY 10018 | Davis-Dinsmore Management Company Attn: Highest Officer Found 65 Madison Avenue, 4th Floor Morristown, NJ 07960 |
| Deutsche Asset Management Americas, Inc. Attn: Highest Officer Found 222 Riverside Plaza Chicago, IL 60606-5808 | Fidelity Management & Research Company Attn: Highest Officer Found 82 Devonshire Street Boston, MA 02109 |

3

| | |
|---|---|
| Froley, Revy Investment Co., Inc.<br>Attn: Highest Officer Found<br>10900 Wilshire Blvd., #900<br>Los Angeles, CA 90024 | Gabelli Asset Management Company<br>1 Corporate Center<br>Rye, NY 10580-1422 |
| Gabelli Asset Management UK LTD.<br>Attn: Highest Officer Found<br>5 Princes Gate, London<br>SW7 1QJ | ING Investments, LLC<br>Attn: Highest Officer Found<br>7337 E. Doubletree Ranch Road<br>Scottsdale, AZ 85258 |
| Lord, Abbett & Co. LLC<br>Attn: Highest Officer Found<br>90 Hudson Street<br>Jersey City, NJ 07302 | Nuveen Asset Management<br>Attn: Highest Officer Found<br>333 W. Wacker Dr., #3200<br>Chicago, IL 60606-2290 |
| Oaktree Capital Management, LLC<br>Attn: Highest Office Found<br>333 S. Grand Ave., 28th Floor<br>Los Angeles, CA 90071 | Oppenheimerfunds, Inc.<br>Attn: Highest Officer Found<br>235 Liberty Street, 11th Floor<br>2 World Financial Center<br>New York, NY 10281 |
| Putnam Investment Management LLC<br>Attn: Highest Officer Found<br>One Post Office Square<br>Boston, MA 02109 | Shenkman Capital Management, Inc.<br>Attn: Highest Officer Found<br>461 Fifth Ave., 22nd Floor<br>New York, NY 10017 |
| SC Cowen & Co., LLC<br>Attn: Highest Officer Found<br>1221 Avenue of the Americas<br>New York, NY 10020-1001 | Tealwood Asset Management<br>Attn: Highest Officer Found<br>100 South 5th Street, Suite 410<br>Minneapolis, MN 55402-1229 |
| ING Investment Management Co.<br>Attn: Highest Officer Found<br>230 Park Avenue<br>New York, NY 10169 | Penn Capital Management<br>Attn: Highest Officer Found<br>52 Haddonfield-Berlin Road<br>Cherry Hill, NJ 08034 |

Edward W. Harris III

OF COUNSEL:

SOMMER BARNARD ATTORNEYS, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Telephone: (317) 713-3500
Fax: (317) 713-3699

4

STATE OF INDIANA        )        IN THE MARION SUPERIOR COURT
                        ) SS:
COUNTY OF MARION        )        CAUSE NO.: 49D01-0505-PL-018784


EMMIS COMMUNICATIONS CORPORATION,        )
                                         )
        Plaintiff,                       )
                                         )
        vs.                              )
                                         )
ADVENT CAPITAL MANAGEMENT, L.L.C.,       )
OPPENHEIMERFUNDS, INC., FROLEY, REVY     )
INVESTMENT COMPANY INC., MERRILL LYNCH   )
INVESTMENT MANAGERS (NJ), NUVEEN ASSET   )
MANAGEMENT, PUTNAM INVESTMENT            )
MANAGEMENT, L.L.C., SHENKMAN CAPITAL     )
MANAGEMENT, INC., OAKTREE CAPITAL        )
MANAGEMENT, LLC, GABELLI ASSET           )
MANAGEMENT COMPANY, FIDELITY             )
MANAGEMENT & RESEARCH COMPANY A/K/A      )
FMR CORP., DAVIS/DINSMORE MANAGEMENT     )
COMPANY, GABELLI ASSET MANAGEMENT        )
(UK) LTD., LORD, ABBETT & CO. LLC,       )
DEUTSCHE ASSET MANAGEMENT AMERICAS,      )
INC., ING INVESTMENTS, LLC (ARIZONA), ING )
INVESTMENT MANAGEMENT CO. (CT), SG       )
COWEN & CO., LLC, TEALWOOD ASSET         )
MANAGEMENT, INC., SMC CAPITAL, INC.,     )
MORGAN STANLEY INVESTMENT                )
MANAGEMENT INC. (US), PENN CAPITAL       )
MANAGEMENT, INC., BLACKROCK FINANCIAL    )
MANAGEMENT (VALUE), MFC GLOBAL           )
INVESTMENT MANAGEMENT, ST. PAUL          )
TRAVELERS COMPANIES, INC., WELLS FARGO   )
BANK, N.A., PEKIN SINGER STRAUSS ASSET   )
MANAGEMENT INC.,                         )
                                         )
        Defendants.                      )

**FILED**

(43)   MAY 1 9 2005

CLERK OF THE
MARION CIRCUIT COURT

## AFFIDAVIT OF JILL GREENTHAL

        I, JILL GREENTHAL, affirm under the penalties for perjury that the

following representations are true:

1. I am currently a Senior Managing Director at The Blackstone Group. Previously, I was a Managing Director at Donaldson Lufkin & Jenrette Securities, Inc. ("DLJ"), and subsequently AT Credit Suisse First Boston LLC, the successor in interest to DLJ.

2. While at DLJ, I was the lead banker on the October 26, 1999, offering by Emmis Communications Corporation ("Emmis") of 2,500,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock (the "Preferred"), which DLJ underwrote. In the course of my work on the Emmis offering, I negotiated the terms of the Preferred with Emmis representatives.

3. I understand that an issue has arisen with respect to one of the anti-dilution provisions of the Preferred, which provides for an adjustment to the conversion price in the event of a tender offer by Emmis for its own stock (a "self-tender").

4. It was my understanding and intention, throughout the course of negotiating and effectuating the offering of the Preferred, that the antidilution provisions would be designed to protect the economic interests of holders of the Preferred – to ensure that those interests would not be impaired – in the event of certain actions by Emmis that would otherwise benefit holders of Emmis's common stock at the expense of the Preferred, such as certain dividends, stock splits, issuance of options or warrants, and self-tenders.

5. I never understood or intended that any provision in the terms of the Preferred would make holders of the Preferred better off in the event of any of these actions than they would otherwise be. I understood and intended that the antidilution provisions would provide protection for holders of the Preferred in the event of a self-

2

tender, as in the case of the other transactions covered by those provisions – not that there would be any extraordinary or disproportionate benefit to the Preferred in the event of a self-tender. This is consistent with my understanding of antidilution provisions in other offerings I have handled over the years.

6.      During the course of my work on the Preferred offering, I had no discussion, and I am not aware of any discussion by anyone else involved in the offering, suggesting that any provision in the terms of the Preferred would or should benefit holders of the Preferred in the event of a self-tender, beyond making them whole for the impairment to their economic interest that a self-tender would otherwise create.

7.      I have reviewed Section 9(c)(v) of Exhibit A to Emmis's Second Amended and Restated Articles of Incorporation, which deals with adjustments to the conversion price of the Preferred in the event of a distribution by Emmis to common stockholders of cash, certain securities and other assets. As written, Section 9(c)(v) applies the same adjustment formula to those events as it does to a self-tender. That was a mistake.

8.      In the course of selling and marketing the Preferred, we did not circulate Emmis's Second Amended and Restated Articles of Incorporation, which contained the mistake discussed above. Rather, the Preferred was sold and marketed by means of a Prospectus that was distributed to potential purchasers of the Preferred, and which contained no suggestion that any of the antidilution provisions of the Preferred would confer any benefit on holders of the Preferred beyond making them whole for any impairment to their economic interest that would otherwise result from actions by Emmis conferring benefits on holders of Emmis common stock.

3

I affirm under the penalties for perjury that the foregoing representations are true.

Dated: 5/16/05

_JILL GREENTHAL_

4

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing has been served this 19th day of May, 2005, by certified mail/return receipt requested, postage prepaid, upon all defendants at the addresses listed on the summonses to them, as follows:

Merrill Lynch Investment Managers, L.P.
c/o CT Corporation System
111 Eighth avenue
New York, NY 10011

Blackrock Financial Management, Inc.
Attn: Highest Office Found
40 East 52nd Street
New York, NY 10022

Pekin Singer & Strass Asset Management,
Inc.
Attn: Highest Officer Found
311 S. Wacker Dr., #4990
Chicago, IL 60606-6622

The St. Paul Travelers Companies, Inc.
Attn: Highest Officer Found
385 Washington Street
St. Paul, MN 55102-1309

Advent Capital Management, LLC
Attn: Highest Officer Found
1065 Avenue of the Americas
31st Floor
New York, NY 10018

Deutsche Asset Management Americas, Inc.
Attn: Highest Officer Found
222 Riverside Plaza
Chicago, IL 60606-5808

Froley, Revy Investment Co., Inc.
Attn: Highest Officer Found
10900 Wilshire Blvd., #900
Los Angeles, CA 90024
Gabelli Asset Management UK LTD.
Attn: Highest Officer Found

SMC Capital, Inc.
Attn: Highest Officer Found
4350 Brownsboro Road, #310
Louisville, KY 40207

MFS Global Investment Management,
Inc.
Attn: Highest Officer Found
200 Clarendon Street, T-58
Boston, MA 02117

Wells Fargo Bank, N.A.
Attn: Highest Officer Found
420 Montgomery Street
San Francisco, CA 94104-1205

Morgan Stanley Investment Management,
Inc.
Attn: Highest Officer Found
1221 6th Avenue
New York, NY 10020

Davis-Dinsmore Management Company
Attn: Highest Officer Found
65 Madison Avenue, 4th Floor
Morristown, NJ 07960

Fidelity Management & Research
Company
Attn: Highest Officer Found
82 Devonshire Street
Boston, MA 02109

Gabelli Asset Management Company
1 Corporate Center
Rye, NY 10580-1422

ING Investments, LLC
Attn: Highest Officer Found

1

5 Princes Gate, London
SW7 1QJ

Lord, Abbett & Co. LLC
Attn: Highest Officer Found
90 Hudson Street
Jersey City, NJ 07302

Oaktree Capital Management, LLC
Attn: Highest Office Found
333 S. Grand Ave., 28th Floor
Los Angeles, CA 90071

Putnam Investment Management LLC
Attn: Highest Officer Found
One Post Office Square
Boston, MA 02109

SC Cowen & Co., LLC
Attn: Highest Officer Found
1221 Avenue of the Americas
New York, NY 10020-1001

ING Investment Management Co.
Attn: Highest Officer Found
230 Park Avenue
New York, NY 10169

7337 E. Doubletree Ranch Road
Scottsdale, AZ 85258

Nuveen Asset Management
Attn: Highest Officer Found
333 W. Wacker Dr., #3200
Chicago, IL 60606-2290

Oppenheimerfunds, Inc.
Attn: Highest Officer Found
235 Liberty Street, 11th Floor
2 World Financial Center
New York, NY 10281

Shenkman Capital Management, Inc.
Attn: Highest Officer Found
461 Fifth Ave., 22nd Floor
New York, NY 10017

Tealwood Asset Management
Attn: Highest Officer Found
100 South 5th Street, Suite 410
Minneapolis, MN 55402-1229

Penn Capital Management, Inc.
Attn: Highest Officer Found
52 Haddonfield-Berlin Road
Cherry Hill, NJ 08034

Edward W. Harris III

2

STATE OF INDIANA )        IN THE MARION SUPERIOR COURT
                 ) SS:
COUNTY OF MARION )        CAUSE NO.: 49D01-0505-PL-018784

EMMIS COMMUNICATIONS CORPORATION,          )
                                           )
    Plaintiff,                             )
                                           )
    vs.                                    )
                                           )
ADVENT CAPITAL MANAGEMENT, L.L.C.,         )
OPPENHEIMERFUNDS, INC., FROLEY, REVY       )
INVESTMENT COMPANY INC., MERRILL LYNCH     )
INVESTMENT MANAGERS (NJ), NUVEEN ASSET     )
MANAGEMENT, PUTNAM INVESTMENT              )
MANAGEMENT, L.L.C., SHENKMAN CAPITAL       )
MANAGEMENT, INC., OAKTREE CAPITAL          )
MANAGEMENT, LLC, GABELLI ASSET             )
MANAGEMENT COMPANY, FIDELITY               )
MANAGEMENT & RESEARCH COMPANY A/K/A        )
FMR CORP., DAVIS/DINSMORE MANAGEMENT       )
COMPANY, GABELLI ASSET MANAGEMENT          )
(UK) LTD., LORD, ABBETT & CO. LLC,         )
DEUTSCHE ASSET MANAGEMENT AMERICAS,        )
INC., ING INVESTMENTS, LLC (ARIZONA), ING  )
INVESTMENT MANAGEMENT CO. (CT), SG         )
COWEN & CO., LLC, TEALWOOD ASSET           )
MANAGEMENT, INC., SMC CAPITAL, INC.,       )
MORGAN STANLEY INVESTMENT                  )
MANAGEMENT INC. (US), PENN CAPITAL         )
MANAGEMENT, INC., BLACKROCK FINANCIAL      )
MANAGEMENT (VALUE), MFC GLOBAL             )
INVESTMENT MANAGEMENT, ST. PAUL            )
TRAVELERS COMPANIES, INC., WELLS FARGO     )
BANK, N.A., PEKIN SINGER STRAUSS ASSET     )
MANAGEMENT INC.,                           )
                                           )
    Defendants.                            )

FILED

(43)  MAY 1 9 2005

*signature*
CLERK OF THE
MARION CIRCUIT COURT

## AFFIDAVIT OF JEFFREY H. SMULYAN

    I, Jeffrey H. Smulyan, affirm under the penalties for perjury that the

following representations are true:

1.      I am Chief Executive Officer, Chairman of the Board of Directors
and President of Emmis Communications Corporation ("Emmis"). I founded Emmis in
1979 and have held the positions of Chief Executive Officer and Chairman of the Board
of Directors since 1982. I have held the position of President since 1994.

2.      On October 26, 1999, Emmis commenced an offering of 2,500,000
shares of 6.25% Series A Cumulative Convertible Preferred Stock (the "Preferred"),
underwritten by Donaldson, Lufkin & Jenrette Securities, Inc. ("DLJ").

3.      In connection with the offering of the Preferred, the Board of
Directors of Emmis delegated to me, along with Walter Z. Berger, the responsibility of
setting the terms of the Preferred through negotiations with DLJ. Mr. Berger was then,
and is now, Executive Vice President, Treasurer and Chief Financial Officer of Emmis.
Mr. Berger and I both negotiated the terms of the Preferred with Jill Greenthal, the lead
banker on the offering at DLJ.

4.      I understand that an issue has arisen with respect to one of the
antidilution provisions of the Preferred, which provides for an adjustment to the
conversion price in the event of a tender offer by Emmis for its own stock (a "self-
tender).

5.      It was my understanding and intention, throughout the course of
negotiating and effectuating the offering of the Preferred, that the antidilution provisions
would be designed to protect the economic interests of holders of the Preferred – to
ensure that those interests would not be impaired – in the event of certain actions by
Emmis that would otherwise benefit holders of Emmis's common stock at the expense of

2

the Preferred, such as certain dividends, stock splits, issuance of options or warrants, and self-tenders.

6. I never understood or intended that any provision in the terms of the Preferred would make holders of the Preferred better off in the event of any of these actions than they would otherwise be. I understood and intended that the antidilution provisions would provide protection for holders of the Preferred in the event of a self-tender, as in the case of the other transactions covered by those provisions – not that there would be any different or extraordinary benefit to the Preferred in the event of a self-tender.

7. Throughout the negotiation and implementation of the Preferred offering, I had no discussion, and I am not aware of any discussion by anyone else involved in the offering, suggesting that any provision in the terms of the Preferred would or should benefit holders of the Preferred in the event of a self-tender, beyond making them whole for the impairment to their economic interest that a self-tender would otherwise create.

8. More specifically, I understand that one of the provisions of the Preferred, if applied as written, could increase the potential share of common stock of Emmis held by holders of the Preferred from about six percent to as much as 60 percent as a result of the self-tender offer that Emmis commenced on Monday, May 16, 2005. Any such provision is a mistake. It was never my intention or understanding that any provision regarding the Preferred could have this effect, and I never became aware of any communication by anyone involved in the offering suggesting this was a possibility. If I had understood that the documentation of the Preferred contained such a provision, I

3

would have insisted that it be removed.  If DLJ refused to remove it I would have
recommended that the Board of Directors cancel the offering.

     I affirm under the penalties for perjury that the foregoing representations are true.

Dated:  _5 - /8 - 05_                                   _____
                                         Jeffrey H. Smulyan

4

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing has been served this 19th day of May, 2005, by certified mail/return receipt requested, postage prepaid, upon all defendants at the addresses listed on the summonses to them, as follows:

Merrill Lynch Investment Managers, L.P.
c/o CT Corporation System
111 Eighth avenue
New York, NY 10011

Blackrock Financial Management, Inc.
Attn: Highest Office Found
40 East 52nd Street
New York, NY 10022

Pekin Singer & Strass Asset Management,
Inc.
Attn: Highest Officer Found
311 S. Wacker Dr., #4990
Chicago, IL 60606-6622

The St. Paul Travelers Companies, Inc.
Attn: Highest Officer Found
385 Washington Street
St. Paul, MN 55102-1309

Advent Capital Management, LLC
Attn: Highest Officer Found
1065 Avenue of the Americas
31st Floor
New York, NY 10018

Deutsche Asset Management Americas, Inc.
Attn: Highest Officer Found
222 Riverside Plaza
Chicago, IL 60606-5808

Froley, Revy Investment Co., Inc.
Attn: Highest Officer Found
10900 Wilshire Blvd., #900
Los Angeles, CA 90024
Gabelli Asset Management UK LTD.
Attn: Highest Officer Found

SMC Capital, Inc.
Attn: Highest Officer Found
4350 Brownsboro Road, #310
Louisville, KY 40207

MFS Global Investment Management,
Inc.
Attn: Highest Officer Found
200 Clarendon Street, T-58
Boston, MA 02117

Wells Fargo Bank, N.A.
Attn: Highest Officer Found
420 Montgomery Street
San Francisco, CA 94104-1205

Morgan Stanley Investment Management,
Inc.
Attn: Highest Officer Found
1221 6th Avenue
New York, NY 10020

Davis-Dinsmore Management Company
Attn: Highest Officer Found
65 Madison Avenue, 4th Floor
Morristown, NJ 07960

Fidelity Management & Research
Company
Attn: Highest Officer Found
82 Devonshire Street
Boston, MA 02109

Gabelli Asset Management Company
1 Corporate Center
Rye, NY 10580-1422

ING Investments, LLC
Attn: Highest Officer Found

5 Princes Gate, London
SW7 1QJ

Lord, Abbett & Co. LLC
Attn: Highest Officer Found
90 Hudson Street
Jersey City, NJ 07302

Oaktree Capital Management, LLC
Attn: Highest Office Found
333 S. Grand Ave., 28th Floor
Los Angeles, CA 90071

Putnam Investment Management LLC
Attn: Highest Officer Found
One Post Office Square
Boston, MA 02109

SC Cowen & Co., LLC
Attn: Highest Officer Found
1221 Avenue of the Americas
New York, NY 10020-1001

ING Investment Management Co.
Attn: Highest Officer Found
230 Park Avenue
New York, NY 10169

7337 E. Doubletree Ranch Road
Scottsdale, AZ 85258

Nuveen Asset Management
Attn: Highest Officer Found
333 W. Wacker Dr., #3200
Chicago, IL 60606-2290

Oppenheimerfunds, Inc.
Attn: Highest Officer Found
235 Liberty Street, 11th Floor
2 World Financial Center
New York, NY 10281

Shenkman Capital Management, Inc.
Attn: Highest Officer Found
461 Fifth Ave., 22nd Floor
New York, NY 10017

Tealwood Asset Management
Attn: Highest Officer Found
100 South 5th Street, Suite 410
Minneapolis, MN 55402-1229

Penn Capital Management, Inc.
Attn: Highest Officer Found
52 Haddonfield-Berlin Road
Cherry Hill, NJ 08034

Edward W. Harris III



Express

ⓒc

ner: Seal only when using a FedEx Ship o

From:    Origin ID:    (317)713-3500
M. T. Doherty, Esq.
Sommer Barnard, PC
One Indiana Square
Suite 3500
INDIANAPOLIS, IN 46204

FedEx
Express
E
CLS123M446/18

Ship Date: 19MAY05
Actual Wgt: 2 LB
System#: 2736352/INET2000
Account#: S *********

REF: 11495-9462

Delivery Address Bar Code

SHIP TO:    (317)713-3500        BILL SENDER
c/o CT Corporation Attn: Highest Of
Merrill Lynch Investment Managers
111 Eighth Avenue

New York, NY 10011



PRIORITY OVERNIGHT

TRK#    7905 1935 7007

10011    -NY-US

NE



| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: 49D01-0505-PL-018784 |

EMMIS COMMUNICATIONS CORPORATION,    )
                                     )
    Plaintiff,                        )
                                     )
    vs.                               )
                                     )
ADVENT CAPITAL MANAGEMENT, L.L.C.,   )
OPPENHEIMERFUNDS, INC., FROLEY, REVY )
INVESTMENT COMPANY INC., MERRILL LYNCH )
INVESTMENT MANAGERS (NJ), NUVEEN ASSET )
MANAGEMENT, PUTNAM INVESTMENT        )
MANAGEMENT, L.L.C., SHENKMAN CAPITAL )
MANAGEMENT, INC., OAKTREE CAPITAL    )
MANAGEMENT, LLC, GABELLI ASSET       )
MANAGEMENT COMPANY, FIDELITY         )
MANAGEMENT & RESEARCH COMPANY A/K/A  )
FMR CORP., DAVIS/DINSMORE MANAGEMENT )
COMPANY, GABELLI ASSET MANAGEMENT    )
(UK) LTD., LORD, ABBETT & CO. LLC,   )
DEUTSCHE ASSET MANAGEMENT AMERICAS,  )
INC., ING INVESTMENTS, LLC (ARIZONA), ING )
INVESTMENT MANAGEMENT CO. (CT), SG   )
COWEN & CO., LLC, TEALWOOD ASSET     )
MANAGEMENT, INC., SMC CAPITAL, INC., )
MORGAN STANLEY INVESTMENT            )
MANAGEMENT INC. (US), PENN CAPITAL   )
MANAGEMENT, INC., BLACKROCK FINANCIAL )
MANAGEMENT (VALUE), MFC GLOBAL       )
INVESTMENT MANAGEMENT, ST. PAUL      )
TRAVELERS COMPANIES, INC., WELLS FARGO )
BANK, N.A., PEKIN SINGER STRAUSS ASSET )
MANAGEMENT INC.,                     )
                                     )
    Defendants.                       )

FILED

(43)   MAY 1 9 2005

CLERK OF THE
MARION CIRCUIT COURT

## AFFIDAVIT OF EDWARD W. HARRIS III

I, Edward W. Harris III, affirm under the penalties for perjury that the

following representations are true:

1.      I am a member of the law firm of Sommer & Barnard Attorneys,

P.C., attorneys for plaintiff Emmis Communications Corporation ("Emmis") in this

action. I am submitting this Affidavit in support of Emmis's Motion for Expedited

Discovery, and specifically, to place before the Court certain documents relevant to that

motion.

2.      Attached hereto as Exhibit 1 is a copy of the Prospectus issued by

Emmis in connection with its October 26, 1999, offering of 2,500,000 shares of 6.25%

Series A Cumulative Convertible Preferred Stock (the "Preferred").

3.      Attached hereto as Exhibit 2 is a copy of Exhibit A to the Second

Amended and Restated Articles of Incorporation of Emmis.

4.      Attached hereto as Exhibit 3 is a copy of the Articles of Correction

that Emmis delivered to the Indiana Secretary of State pursuant to Ind. Code Ann. § 23-1-

18-5(b) (2004), and the Secretary of State approved and filed, on May 16, 2005.

5.      Attached hereto as Exhibit 4 is a copy of a press release that Emmis

issued on May 10, 2005.

6.      Attached hereto as Exhibit 5 is a copy of the Form TO that Emmis

filed with the Securities and Exchange Commission on May 16, 2005.

I affirm under the penalties for perjury that the foregoing representations

are true.

Dated:   May 19, 2005

Edward W. Harris III

2

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Affidavit of Edward W.

Harris III has been served this ___1⁹___ day of May, 2005, by certified mail/return

receipt requested, postage prepaid, upon all defendants at the addresses listed on the

summonses to them, as follows:

| | |
|---|---|
| Merrill Lynch Investment Managers, L.P.<br>c/o CT Corporation System<br>111 Eighth avenue<br>New York, NY 10011 | SMC Capital, Inc.<br>Attn: Highest Officer Found<br>4350 Brownsboro Road, #310<br>Louisville, KY 40207 |
| Blackrock Financial Management, Inc.<br>Attn: Highest Office Found<br>40 East 52nd Street<br>New York, NY 10022 | MFS Global Investment Management, Inc.<br>Attn: Highest Officer Found<br>200 Clarendon Street, T-58<br>Boston, MA 02117 |
| Pekin Singer & Strass Asset Management, Inc.<br>Attn: Highest Officer Found<br>311 S. Wacker Dr., #4990<br>Chicago, IL 60606-6622 | Wells Fargo Bank, N.A.<br>Attn: Highest Officer Found<br>420 Montgomery Street<br>San Francisco, CA 94104-1205 |
| The St. Paul Travelers Companies, Inc.<br>Attn: Highest Officer Found<br>385 Washington Street<br>St. Paul, MN 55102-1309 | Morgan Stanley Investment Management, Inc.<br>Attn: Highest Officer Found<br>1221 6th Avenue<br>New York, NY 10020 |
| Advent Capital Management, LLC<br>Attn: Highest Officer Found<br>1065 Avenue of the Americas<br>31st Floor<br>New York, NY 10018 | Davis-Dinsmore Management Company<br>Attn: Highest Officer Found<br>65 Madison Avenue, 4th Floor<br>Morristown, NJ 07960 |
| Deutsche Asset Management Americas, Inc.<br>Attn: Highest Officer Found<br>222 Riverside Plaza<br>Chicago, IL 60606-5808 | Fidelity Management & Research Company<br>Attn: Highest Officer Found<br>82 Devonshire Street<br>Boston, MA 02109 |

| | |
|---|---|
| Froley, Revy Investment Co., Inc.<br>Attn: Highest Officer Found<br>10900 Wilshire Blvd., #900<br>Los Angeles, CA 90024<br><br>Gabelli Asset Management UK LTD.<br>Attn: Highest Officer Found<br>5 Princes Gate, London<br>SW7 1QJ<br><br>Lord, Abbett & Co. LLC<br>Attn: Highest Officer Found<br>90 Hudson Street<br>Jersey City, NJ 07302<br><br>Oaktree Capital Management, LLC<br>Attn: Highest Office Found<br>333 S. Grand Ave., 28th Floor<br>Los Angeles, CA 90071<br><br>Putnam Investment Management LLC<br>Attn: Highest Officer Found<br>One Post Office Square<br>Boston, MA 02109<br><br>SC Cowen & Co., LLC<br>Attn: Highest Officer Found<br>1221 Avenue of the Americas<br>New York, NY 10020-1001<br><br>ING Investment Management Co.<br>Attn: Highest Officer Found<br>230 Park Avenue<br>New York, NY 10169 | Gabelli Asset Management Company<br>1 Corporate Center<br>Rye, NY 10580-1422<br><br>ING Investments, LLC<br>Attn: Highest Officer Found<br>7337 E. Doubletree Ranch Road<br>Scottsdale, AZ 85258<br><br>Nuveen Asset Management<br>Attn: Highest Officer Found<br>333 W. Wacker Dr., #3200<br>Chicago, IL 60606-2290<br><br>Oppenheimerfunds, Inc.<br>Attn: Highest Officer Found<br>235 Liberty Street, 11th Floor<br>2 World Financial Center<br>New York, NY 10281<br><br>Shenkman Capital Management, Inc.<br>Attn: Highest Officer Found<br>461 Fifth Ave., 22nd Floor<br>New York, NY 10017<br><br>Tealwood Asset Management<br>Attn: Highest Officer Found<br>100 South 5th Street, Suite 410<br>Minneapolis, MN 55402-1229<br><br>Penn Capital Management<br>Attn: Highest Officer Found<br>52 Haddonfield-Berlin Road<br>Cherry Hill, NJ 08034 |

Edward W. Harris III

OF COUNSEL:

SOMMER BARNARD ATTORNEYS, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Telephone: (317) 713-3500
Fax: (317) 713-3699

4