

# EMMIS COMMUNICATIONS CORP (EMMS)

ONE EMMIS PLAZA
40 MONUMENT CIRCLE SUITE 700
INDIANAPOLIS, IN 46204
317. 266.0100
http://www.emmis.com

## 424B4

**FINAL PROSPECTUS**
**Filed on 10/27/1999**
File Number 333-88221



**GSI**

LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 1

1

---

---

PROSPECTUS
OCTOBER 26, 1999

EMMIS COMMUNICATIONS CORPORATION LOGO
EMMIS COMMUNICATIONS CORPORATION
2,500,000 SHARES
6.25% SERIES A CUMULATIVE CONVERTIBLE PREFERRED STOCK

---

EMMIS:
- We are one of the largest radio broadcasters in the United States and we also
  operate television broadcasting and magazine publishing businesses.
- Emmis Communications Corporation
  One Emmis Plaza
  40 Monument Circle
  Indianapolis, Indiana 46204
  (317) 266-0100

THE OFFERING:
- We are offering 2,500,000 shares of cumulative convertible preferred stock
  and have granted the underwriters an option to purchase an additional 375,000
  shares to cover over-allotments. The table below does not reflect any
  exercise of this option.
- We plan to use the net proceeds of this offering, together with the net
  proceeds from our concurrent offering of Class A Common Stock, to fund the
  acquisition of additional broadcasting properties and acquisition-related
  expenses and for general corporate purposes. This offering is not contingent
  upon the consummation of any acquisition.
- Closing: October 29, 1999.

MARKET AND SYMBOL:
- Nasdaq National Market: "EMMSP"
- Our Class A Common Stock trades on the Nasdaq National Market under the
  symbol "EMMS." On October 26, 1999, the last reported sales price for our
  Class A Common Stock was $62.50 per share.

CONCURRENT OFFERING:
- We are currently offering, by means of a separate prospectus, 3,440,000
  shares, and a selling stockholder is selling 240,000 shares, of our Class A
  Common Stock, excluding 552,000 shares available to cover over-allotments.
  This offering and the Class A Common Stock offering are not dependent on each
  other.

THE CONVERTIBLE PREFERRED STOCK:
- Liquidation Preference: $50 per share.
- Dividends: 6.25% cumulative annual cash dividends, payable quarterly in
  arrears, commencing on January 15, 2000.
- Conversion Price: $78.125 per share, subject to adjustment (equal to an
  initial conversion ratio of 0.6400 shares of our Class A Common Stock for
  each share of convertible preferred stock).
- Conversion Right: convertible into Class A Common Stock at any time at the
  applicable conversion ratio.
- Optional Redemption: redeemable at a redemption premium of 104.911% (plus
  accumulated and unpaid dividends) on or after April 15, 2001 but prior to
  October 15, 2002 if the trading price for our Class A Common Stock equals or
  exceeds $117.1875 per share for a specified period. We will make additional
  payments if we redeem shares under these circumstances. Beginning on
  October 15, 2002, shares of the convertible preferred stock may be redeemed,
  at any time, at the redemption premiums stated herein, plus accumulated and
  unpaid dividends.

| | PER SHARE | TOTAL |
|---|---|---|
| Public offering price: | $ 50.00 | $125,000,000 |
| Underwriting fees: | $ 1.625 | $ 4,062,500 |
| Proceeds to Emmis: | $48.375 | $120,937,500 |

THIS INVESTMENT INVOLVES RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 12.

---

Neither the Securities and Exchange Commission nor any state securities
commission has approved or disapproved of these securities or determined if this
prospectus is truthful or complete. Any representation to the contrary is a
criminal offense.

---

DONALDSON, LUFKIN & JENRETTE      GOLDMAN, SACHS & CO.
   Book Running Manager                Co-Lead Manager

---

   DEUTSCHE BANC ALEX. BROWN    MORGAN STANLEY DEAN WITTER

2

[The inside front cover page of the prospectus contains a graphic consisting of three pictures across the top and a map and related description beneath the pictures. The pictures consist of:

(1) the words "Listener by Listener" superimposed on a picture of the profile of a man;

(2) the words "Advertiser by Advertiser" superimposed on a picture of a handshake; and

(3) the words "Employee by Employee" superimposed on a picture of a man's head.

The map identifies 16 locations of Emmis operations on a map of the United States. The description beneath the map includes:

(A) a corporate logo and the address of the corporate headquarters;

(B) the following locations, call letters and dial positions of Emmis radio stations and radio networks:

```
Los Angeles    KPWR-FM (Power 106)
New York       WRKS (Kiss-FM)
               WQHT-FM (Hot 97)
               WQCD-FM (CD-101.9)
Chicago        WKQX-FM (Q101)
St. Louis      KSHE-FM (KSHE95)
               WKKX-FM (Kix 106.5)
               WXTM-FM (Extreme 104.1)
Indianapolis   WENS (97.1 FM)
               WIBC (1070 AM)
               WNAP (93.1 FM)
               WTLC (105.7 FM)
               WTLC (1310 AM)
               AgriAmerica
               Network Indiana
Terre Haute    WTHI (99.9 FM)
               WTHI (1480 AM)
               WWVR (105.5 FM)
Hungary        Slager Radio
```

(C) the following locations, call letters and dial positions of Emmis television stations:

```
New Orleans WVUE (Channel 8)
Honolulu KHON (Channel 2)
Green Bay WLUK (Channel 11)
Mobile/Pensacola WALA (Channel 10)
Ft. Myers WFTX (Channel 36)
Terre Haute WTHI (Channel 10)
```

(D) the following list of Emmis publications:

```
Indianapolis Monthly
Atlanta
Cincinnati Magazine
Texas Monthly
Country Sampler]
```

3

TABLE OF CONTENTS

Page

Prospectus Summary.................    1
Risk Factors.......................   12
Use of Proceeds....................   20
Price Range of Class A Common
    Stock...........................   21
Dividend Policy....................   21
Capitalization.....................   22
Recent Developments................   23
Selected Consolidated Financial and
    Other Data......................   26
Management's Discussion and
    Analysis of Financial Condition
    and Results of Operations........   29
Business...........................   37
Management.........................   46
Certain Relationships and Related
    Party Transactions...............   48


Page

Principal and Selling
    Stockholders.....................   49
Description of Common Stock........   51
Description of the Convertible
    Preferred Stock..................   54
Certain United States Federal Tax
    Considerations...................   65
Description of Certain
    Indebtedness.....................   72
Underwriting.......................   75
Legal Matters......................   77
Experts............................   77
Where You Can Find More
    Information......................   79
Index to Financial Statements......  F-1

4

## PROSPECTUS SUMMARY

You should read the entire prospectus, including the financial data, related notes and information incorporated by reference, before making an investment decision. Market and industry data used in this prospectus are based on independent industry publications, other publicly available information or the good faith belief of our management. All references to Emmis in this prospectus mean Emmis Communications Corporation and its subsidiaries collectively, except where it is clear we mean only the parent corporation. The information contained in this prospectus assumes that the underwriters do not exercise the over-allotment option.

## EMMIS COMMUNICATIONS

We are one of the largest operators of radio broadcasting stations in the United States. Approximately 8.5 million listeners tune in to our radio stations each week. Our focus is primarily large-market radio, and we operate five FM radio stations in the nation's three largest radio markets of New York City, Los Angeles and Chicago. In each of these markets we have developed top-performing radio stations which rank either first or second in terms of primary demographic target audience share according to the Spring 1999 Arbitron Survey. In addition, we enjoy strong market positions in St. Louis, Indianapolis and Terre Haute, Indiana, where we own a total of eight FM radio stations and three AM radio stations. We are in the process of acquiring additional radio stations in St. Louis, Missouri which will complement our existing station portfolio.

The combination of our strong large-market radio presence, the diversity of our station formats and our advertising, sales and programming expertise has allowed us to achieve same station revenue growth rates in excess of radio industry growth. In addition to our strong internal growth, we have demonstrated the ability to selectively acquire underdeveloped properties in desirable markets and create value by developing those properties. We have been successful in acquiring these types of radio stations and improving their ratings, revenues and cash flow with our marketing focus and innovative programming expertise.

While our radio broadcasting operations accounted for greater than 75% of our broadcast cash flow for the six months ending August 31, 1999, we also own television broadcasting and magazine publishing operations. In 1998, we acquired six television stations, located in New Orleans, Louisiana, Mobile, Alabama, Green Bay, Wisconsin, Honolulu, Hawaii, Fort Myers, Florida and Terre Haute, Indiana. Like our previous radio station acquisitions, the television stations were generally underdeveloped properties located in desirable markets. Our goal is to affiliate our television group with the newer networks such as the WB and Fox television networks, which best leverage our strengths by targeting younger viewers and providing a higher degree of programming flexibility. With our innovative, research-based programming and management experience, we have successfully increased the broadcast cash flow margins of our television stations to 32% in the six months ended August 31, 1999 from 26% in the fiscal year prior to our acquisition, and we believe that we have significant additional margin enhancement opportunities.

1

5

In addition to our domestic broadcasting properties, we operate news and agriculture information networks in Indiana, publish Indianapolis Monthly, Atlanta, Cincinnati, Texas Monthly and Country Sampler and related magazines, and have a 54% interest in a national radio station in Hungary.

## BUSINESS STRATEGY

We are committed to maintaining our leadership position in broadcasting, enhancing the performance of our broadcast properties, and distinguishing ourselves through the quality of our operations. Our strategy has the following principal components:

- Develop innovative programming for our radio and television stations based on local market research and audience preferences;

- Emphasize a focused sales and marketing strategy based on advertiser demand and our programming compared to the competitive formats within each market;

- Pursue strategic acquisitions in desirable markets and enhance their cash flow; and

- Encourage an entrepreneurial management approach that empowers and rewards all employees based on performance and promotes equity ownership in Emmis.

## RECENT DEVELOPMENTS

ORLANDO ACQUISITION

Consistent with our acquisition strategy, on June 3, 1999, we entered into a definitive agreement to purchase substantially all of the assets of television station WKCF in Orlando, Florida, for approximately $191.5 million in cash. The Orlando market ranks as the 22nd largest television market in the United States and is projected to be one of the top five fastest growing markets in terms of retail sales and population in the nation's largest 25 markets.

WKCF is an affiliate of the WB television network. Like the Fox television network, WB targets a younger audience and provides us with a higher degree of programming flexibility than is available with the three traditional networks. For the 1998-1999 television season, the WB television network had the highest growth rate among television networks in the United States in terms of household viewership and was again the number one network among teens. We expect the transaction to close during our fiscal quarter ending November 30, 1999.

ST. LOUIS ACQUISITION

In June 1999, we entered into an agreement with a former executive of Sinclair Broadcast Group, Inc. to purchase his rights under an option to acquire certain broadcast properties in St. Louis, Missouri. The option allows us to purchase, at fair market value, six radio stations and one television station from Sinclair. The option outlines an appraisal procedure to determine the fair market value of the stations, provides for the acquisition to be on customary terms and conditions and includes a mechanism for establishing the closing date. Although the option has been exercised, the actual purchase price is still to be determined, and we have not yet reached an understanding with Sinclair on the material terms and conditions customary for a transaction of this type. Until the material terms are determined, the acquisition is not considered probable

2

6

for financial reporting purposes. However, we and Sinclair are obligated under the option to act in good faith in making these determinations, and we do expect ultimately to consummate the acquisition, subject to FCC and Department of Justice approval. Due to FCC limitations on the number of stations we can operate in St. Louis, we anticipate divesting three radio stations in connection with this acquisition. Even after these divestitures, the remaining radio stations will complement one another and should allow us to realize greater operating efficiencies. St. Louis is the nineteenth ranked radio market and the twenty-first ranked television market in the country.

ARGENTINA ACQUISITIONS

We have signed an agreement to purchase one FM radio station and one AM radio station in Buenos Aires, Argentina. We are also discussing an additional potential acquisition of radio broadcast properties in Argentina and are in the process of negotiating the terms and conditions of a definitive purchase agreement. Consistent with our international acquisition strategy, we are pursuing local minority-interest partners for these investments. We expect that these acquisitions would have an aggregate purchase price of approximately $25 million.

LIBERTY MEDIA INVESTMENT

On October 25, 1999, we entered into an agreement with Liberty Media Corporation for Liberty to purchase 2.7 million shares of our Class A Common Stock for approximately $150 million. Liberty will become our second largest shareholder behind our Chairman and CEO, Jeffrey Smulyan, assuming full exercise of his outstanding options. Liberty's shares will represent approximately 12% of our common shares outstanding following the completion of our concurrent offering of Class A Common Stock, assuming no exercise of the underwriters' over-allotment option in that offering and excluding common stock issuable upon conversion of the convertible preferred stock. Closing of the transaction is subject to certain conditions. We intend to use the proceeds of this investment to more aggressively pursue attractive opportunities to acquire radio broadcasting properties in the top 20 markets in the United States.

3

7

## STATIONS

The following table sets forth certain information regarding our radio stations and their broadcast markets. In the table, "Market Rank by Revenue" is the ranking of the market revenue size of the principal radio market served by the station among all radio markets in the United States. Market revenue and ranking figures are from Duncan's Radio Market Guide (1998 ed.). We own a 40% equity interest in the publisher of Duncan's Radio Market Guide. "Ranking in Primary Demographic Target" is the ranking of the station among all radio stations in its market based on the Spring 1999 Arbitron Survey. A "t" indicates the station tied with another station for the stated ranking. "Station Audience Share" represents a percentage generally computed by dividing the average number of persons over age 12 listening to a particular station during specified time periods by the average number of such persons for all stations in the market area as determined by Arbitron.

| STATION AND MARKET | MARKET RANK BY REVENUE | FORMAT | PRIMARY DEMOGRAPHIC TARGET AGES | RANKING IN PRIMARY DEMOGRAPHIC TARGET | STATION AUDIENCE SHARE |
|---|---|---|---|---|---|
| Los Angeles, CA | 1 | | | | |
| KPWR-FM | | Dance/Contemporary Hit | 12-24 | 1 | 4.0 |
| New York, NY | 2 | | | | |
| WQHT-FM | | Dance/Contemporary Hit | 12-24 | 1 | 5.4 |
| WRKS-FM | | Classic Soul/Smooth R&B | 25-54 | 7 | 3.3 |
| WQCD-FM | | Contemporary Jazz | 25-54 | 9t | 2.9 |
| Chicago, IL | 3 | | | | |
| WKQX-FM | | New Rock | 18-34 | 2 | 4.0 |
| St. Louis, MO | 18 | | | | |
| KSHE-FM | | Album Oriented Rock | 25-54 | 9 | 3.0 |
| WKKX-FM | | Country | 25-54 | 5t | 4.5 |
| WXTM-FM | | Extreme Rock | 18-34 | 10 | 2.2 |
| Indianapolis, IN | 30 | | | | |
| WENS-FM | | Adult Contemporary | 25-54 | 3 | 5.2 |
| WIBC-AM | | News/Talk | 35-64 | 2 | 9.1 |
| WNAP-FM | | Classic Rock | 18-34 | 4 | 4.3 |
| WTLC-FM | | Urban Contemporary | 25-54 | 10 | 4.9 |
| WTLC-AM | | Solid Gold Soul, Gospel and Talk | 25-54 | 19t | 1.1 |
| Terre Haute, IN | 172 | | | | |
| WTHI-FM | | Country | 25-54 | 1 | 20.3 |
| WTHI-AM(1) | | Talk | 35-54 | 8 | 1.7 |
| WWVR-FM | | Classic Rock | 25-54 | 3t | 7.1 |

---------------

(1) We are currently finalizing an agreement to donate this station to a charitable organization. The station has projected revenues of less than $100,000 and a negative projected broadcast cash flow for the current fiscal year.

4

8

The following table sets forth certain information regarding our television stations and their broadcast markets. In the table, "DMA Rank" is estimated by the A.C. Nielsen Company as of January 1999. Rankings are based on the relative size of a station's market among the 210 generally recognized Designated Market Areas ("DMAs"), as defined by Nielsen. "Number of Stations in Market" represents the number of television stations ("Reportable Stations") designated by Nielsen as "local" to the DMA, excluding public television stations and stations which do not meet minimum Nielsen reporting standards (i.e., a weekly cumulative audience of less than 2.5%) for reporting in the Sunday through Saturday, 9:00 a.m. to midnight time period. "Station Rank" reflects the station's rank relative to other Reportable Stations based upon the DMA rating as reported by Nielsen from 9:00 a.m. to midnight, Sunday through Saturday during May 1999. A "t" indicates the station tied with another station for the stated ranking. "Station Audience Share" reflects an estimate of the percentage of DMA households viewing television received by a local commercial station in comparison to other local commercial stations in the market as measured from 9:00 a.m. to midnight, Sunday through Saturday.

| TELEVISION STATION | METROPOLITAN AREA SERVED | DMA RANK | AFFILIATION/ CHANNEL | NUMBER OF STATIONS IN MARKET | STATION RANK | STATION AUDIENCE SHARE |
|---|---|---|---|---|---|---|
| WVUE-TV | New Orleans, LA | 41 | Fox/8 | 8 | 4t | 7 |
| WALA-TV | Mobile, AL-Pensacola, FL | 62 | Fox/10 | 5 | 3t | 10 |
| WLUK-TV | Green Bay, WI | 69 | Fox/11 | 5 | 4 | 8 |
| KHON-TV | Honolulu, HI | 71 | Fox/2 | 6 | 2 | 16 |
| WFTX-TV | Fort Myers, FL | 83 | Fox/36 | 5 | 4 | 7 |
| WTHI-TV | Terre Haute, IN | 139 | CBS/10 | 3 | 1 | 24 |
| WKCF-TV(1) | Orlando, FL | 22 | WB/18 | 7 | 4 | 8 |

---------------

(1) We expect our acquisition of this station to close in the fiscal quarter ending November 30, 1999.

5

9

THE OFFERING

Convertible preferred stock
  offered...................          2,500,000 shares of our 6.25% Series A Cumulative
                                               Convertible Preferred Stock.

Over-allotment option......                    Up to 375,000 shares. If the over-allotment option
                                               is exercised in full by the underwriters, the total
                                               public offering price will be $144 million.
                                               Discounts, commissions and offering expenses are
                                               estimated to be $5 million and net proceeds to us
                                               are estimated to be $139 million.

Liquidation preference.....                    $50 per share stated liquidation preference, plus
                                               any accumulated and unpaid dividends.

Dividends..................                     Cumulative annual cash dividends of $3.125 per
                                               share, payable quarterly in arrears on January 15,
                                               April 15, July 15, and October 15 of each year
                                               commencing January 15, 2000 when, if and as
                                               declared by our board of directors. Our ability to
                                               declare and pay dividends may be limited by
                                               applicable law and the terms of our credit facility
                                               and our subordinated notes.

Conversion.................                     Each share of convertible preferred stock will be
                                               convertible at any time at the option of the holder
                                               into that number of whole shares of our Class A
                                               Common Stock as is equal to the stated liquidation
                                               preference of $50 per share divided by an initial
                                               conversion price of $78.125 subject to adjustment
                                               upon the occurrence of specified events. As a
                                               result, each share of convertible preferred stock
                                               will initially be convertible into 0.6400 shares of
                                               Class A Common Stock.

Optional redemption........                    From April 15, 2001 to October 15, 2002, we may
                                               redeem the convertible preferred stock at a
                                               redemption premium of 104.911% of the stated
                                               liquidation preference, plus accumulated and unpaid
                                               dividends, if any, whether or not declared, if the
                                               closing price of our Class A Common Stock is
                                               greater than $117.1875 (150% of the Conversion
                                               Price) for a specified trading period. In addition
                                               to the foregoing payments, if we undertake a
                                               redemption during this period, holders will also
                                               receive an additional payment equal to the present
                                               value of the dividends that would thereafter have
                                               been payable on the convertible preferred stock
                                               through October 15, 2002.

                                               Beginning on October 15, 2002, we may redeem shares
                                               of convertible preferred stock initially at a
                                               redemption premium of 103.571% of the liquidation
                                               preference and thereafter at prices declining to
                                               100.00%, plus in each case all accumulated and
                                               unpaid dividends, whether or not declared. We would
                                               effect any redemption, in whole or in part, by
                                               delivering cash. Our ability to redeem shares is
                                               limited by provisions of applicable law.

10

Change of control.......... In the event of a change of control of Emmis, holders of the convertible preferred stock will, in the event that the market price per share of our Class A Common Stock at such time is less than the Conversion Price of the convertible preferred stock, have a one-time option to convert such holder's shares of convertible preferred stock into shares of our Class A Common Stock at a conversion price equal to the greater of (1) the market price per share of our Class A Common Stock as of the date of the change of control or (2) 66.67% of the market price of our Class A Common Stock at the close of trading on the issue date of the convertible preferred stock. In lieu of issuing the shares of our Class A Common Stock issuable upon conversion in the event of a change of control, we may, at our option, make a cash payment equal to the market value of the shares of our Class A Common Stock otherwise issuable. See "Description of the Convertible Preferred Stock -- Change of Control."

Voting rights.............. Holders of convertible preferred stock will have no voting rights with respect to general corporate matters except as provided by Indiana law or, in limited circumstances, as provided in the amendment to our articles of incorporation relating to the convertible preferred stock. See "Description of the Convertible Preferred Stock -- Voting Rights."

Ranking.................... The convertible preferred stock will rank senior to our common stock and senior to or ratably with other existing and future series of our preferred stock. We may issue additional series of preferred stock that rank ratably with our convertible preferred stock, including additional shares of convertible preferred stock, without a vote of the holders of convertible preferred stock.

Book-entry, delivery and
form..................... The shares of convertible preferred stock will be issued in the form of one or more fully-registered global certificates and registered in the name of the nominee of the Depository Trust Company, which will act as the securities depositary. See "Description of the Convertible Preferred Stock -- Book Entry; The Depository Trust Company."

U.S. Federal income tax
considerations........... The federal income tax considerations of acquiring and holding our convertible preferred stock and our Class A Common Stock are described in "Certain United States Federal Tax Considerations." Prospective investors are urged to consult their own tax advisors regarding the tax consequences of acquiring, holding or disposing of our convertible preferred stock and Class A Common Stock in light of their own personal investment circumstances.

7

11

| Concurrent Class A Common Stock offering.......... | Concurrently with this offering, we are offering 3,440,000 shares and a selling stockholder is offering 240,000 shares of our Class A Common Stock (excluding a maximum of 552,000 shares which we may issue upon exercise of an over-allotment option). The closing of this offering and the offering of Class A Common Stock are not contingent upon each other. |
|---|---|
| Use of proceeds............ | We intend to use the net proceeds from the convertible preferred stock offering and a concurrent offering of our Class A Common Stock to fund the acquisition of additional broadcasting properties and acquisition-related expenses and for general corporate purposes. The broadcasting properties may include television station WKCF in Orlando, Florida and six radio stations and a television station in St. Louis, Missouri. However, neither this offering nor the concurrent offering of Class A Common Stock are contingent upon the closing of any acquisitions. Pending these uses, we may use all or a portion of the net proceeds to repay amounts outstanding under our credit facility. We will not receive any of the proceeds from the sale of our common stock by the selling stockholder. |
| Class A Common Stock....... | Our Class A Common Stock trades on the Nasdaq National Market under the symbol "EMMS." On October 26, 1999, the last reported sales price for our Class A Common Stock was $62.50 per share. |
| Market and symbol.......... | The convertible preferred stock will trade on the Nasdaq National Market under the symbol "EMMSP." |

8

12

### SUMMARY CONSOLIDATED FINANCIAL AND OTHER DATA
(IN THOUSANDS, EXCEPT PER SHARE DATA)

The summary consolidated financial and other data has been derived, except as otherwise noted, from our consolidated financial statements for the years ended February (29) 28, 1995, 1996, 1997, 1998 and 1999 which have been audited by Arthur Andersen LLP and from our unaudited condensed consolidated financial statements for the six months ended August 31, 1998 and 1999. The summary consolidated financial and other data presented below should be read in conjunction with, and is qualified in its entirety by reference to, our consolidated financial statements for the years ended February 28, 1997, 1998, and 1999 and our unaudited condensed consolidated financial statements for the six months ended August 31, 1998 and 1999 and related notes, which can be found at the end of this prospectus, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained elsewhere in this prospectus.

| | FISCAL YEAR ENDED(1) | | | | | SIX MONTHS ENDED AUGUST 31, | |
| | 1995 | 1996 | 1997 | 1998 | 1999 | 1998 (UNAUDITED) | 1999 |
|---|---|---|---|---|---|---|---|
| OPERATING DATA: | | | | | | | |
| Net revenues | $ 74,604 | $109,244 | $113,720 | $140,583 | $232,836 | $102,493 | $153,881 |
| Operating expenses | 45,990 | 62,466 | 62,433 | 81,170 | 143,348 | 60,858 | 93,122 |
| International business development expenses | 313 | 1,264 | 1,164 | 999 | 1,477 | 561 | 747 |
| Corporate expenses | 3,700 | 4,419 | 5,929 | 6,846 | 10,427 | 3,926 | 6,684 |
| Time brokerage fee | -- | -- | -- | 5,667 | 2,220 | 2,220 | -- |
| Depreciation and amortization | 3,827 | 5,677 | 5,481 | 7,536 | 28,314 | 9,912 | 20,045 |
| Noncash compensation | 600 | 3,667 | 3,465 | 1,482 | 4,269 | 2,036 | 2,293 |
| Operating income | 20,174 | 31,751 | 35,248 | 36,883 | 42,781 | 22,980 | 30,990 |
| Interest expense(2) | 7,849 | 13,540 | 9,633 | 13,772 | 35,650 | 12,629 | 27,165 |
| Loss on donation of radio station | -- | -- | -- | 4,833 | -- | -- | -- |
| Minority interest | -- | -- | -- | -- | -- | 1,875 | 1,525 |
| Other income (expense), net | (170) | (303) | 325 | 6 | 1,914 | 1,123 | (293) |
| Income before income taxes and extraordinary item | 12,155 | 17,908 | 25,940 | 18,284 | 9,045 | 13,349 | 5,057 |
| Income before extraordinary item | 7,627 | 10,308 | 15,440 | 11,084 | 2,845 | 5,949 | 1,457 |
| Net income | $ 7,627 | $ 10,308 | $ 15,440 | $ 11,084 | $ 1,248 | $ 4,352 | $ 1,457 |
| Basic net income per share | $ 0.72 | $ 0.96 | $ 1.41 | $ 1.02 | $ 0.09 | $ 0.33 | $ 0.09 |
| Diluted net income per share | $ 0.70 | $ 0.93 | $ 1.37 | $ 0.98 | $ 0.08 | $ 0.32 | $ 0.09 |
| Weighted average common shares outstanding: | | | | | | | |
| Basic | 10,557 | 10,691 | 10,943 | 10,903 | 14,453 | 13,256 | 15,856 |
| Diluted | 10,832 | 11,084 | 11,291 | 11,362 | 14,848 | 13,662 | 16,306 |

|  | AS OF FEBRUARY (29) 28, | | | | | AS OF AUGUST 31, 1999 (UNAUDITED) |
|---|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 | 1999 |  |
| **BALANCE SHEET DATA:** |  |  |  |  |  |  |
| Cash.................... | $ 3,205 | $ 1,218 | $ 1,191 | $ 5,785 | $ 6,117 | $ 3,061 |
| Working capital........ | 10,088 | 14,761 | 15,463 | 21,635 | 1,249 | 12,308 |
| Net intangible assets(3)............ | 139,729 | 135,830 | 131,743 | 234,558 | 802,307 | 820,789 |
| Total assets........... | 183,441 | 176,566 | 189,716 | 333,388 | 1,014,831 | 1,079,701 |
| Obligations under credit facility and senior subordinated debt................. | 152,000 | 124,000 | 115,000 | 215,000 | 577,000 | 619,000 |
| Shareholders' equity (deficit)............ | (2,661) | 13,884 | 34,422 | 43,910 | 235,549 | 245,049 |

|  | FISCAL YEAR ENDED(1) | | | | | SIX MONTHS ENDED AUGUST 31, | |
|---|---|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 | 1999 | 1998 (UNAUDITED) | 1999 |
| **OTHER DATA(4):** |  |  |  |  |  |  |  |
| Broadcast/publishing cash flow(5)............. | $ 28,614 | $ 46,778 | $ 51,287 | $ 59,413 | $ 89,488 | $ 41,635 | $ 60,759 |
| EBITDA before certain charges(6).............. | 24,601 | 41,095 | 44,194 | 51,568 | 77,584 | 37,148 | 53,328 |
| Cash flows from (used in): |  |  |  |  |  |  |  |
| Operating activities.... | 15,480 | 23,221 | 21,362 | 22,487 | 35,121 | 11,679 | 6,132 |
| Investing activities.... | (102,682) | 222 | (13,919) | (116,693) | (541,470) | (440,638) | (56,785) |
| Financing activities.... | 88,800 | (25,430) | (7,470) | 98,800 | 506,681 | 435,936 | 47,597 |
| Capital expenditures(7)... | 1,081 | 1,396 | 7,559 | 16,991 | 37,383 | 16,503 | 20,831 |

------------------------------
(1) Our fiscal year ends on the last day of February of each year.

(2) Includes debt issuance cost and interest rate cap amortization of $660, $1,742, $1,071, $2,183 and $839 for the years ended February (29) 28, 1995 through 1999, respectively, and $604 and $1,177 for the periods ended August 31, 1998 and 1999, respectively.

(3) Net intangible assets consist primarily of FCC licenses and excess of cost over fair value of net assets of purchased businesses, subscription lists and similar assets, net of accumulated amortization.

(4) In addition, our ratio of earnings to fixed charges was 2.4x, 2.4x, 3.4x, 2.2x and 1.1x for the years ended February (29) 28, 1995 through 1999, respectively, and 1.8x and 1.1x for the six months ended August 31, 1998 and 1999, respectively. Earnings are calculated by adding fixed charges, excluding capitalized interest, to income (loss) before taxes, extraordinary item and minority interest in loss of consolidated subsidiary. Fixed charges include interest, whether expensed or capitalized, the interest component of rental expenses and amortization of debt issuance costs.

(5) We evaluate performance of our operating entities based on broadcast cash flow ("BCF") and publishing cash flow ("PCF"). Management believes that BCF and PCF are useful because they provide a meaningful comparison of operating performance between companies in the industry and serve as an indicator of the market value of a group of stations or publishing entities. BCF and PCF are generally recognized by the broadcast and publishing industries as a measure of performance and are used by analysts who report on the performance of broadcasting and publishing groups. BCF and PCF do not take into account our debt service requirements and other commitments and, accordingly, BCF and PCF are not necessarily indicative of amounts that may be available for dividends, reinvestment in our business or other discretionary uses. BCF and PCF are not measures of liquidity or of performance in accordance with generally accepted accounting principles, and should be viewed as a supplement to and not a substitute for our results of operations presented on the basis of generally accepted

10

14

accounting principles. Moreover, BCF and PCF are not standardized measures and may be calculated in a number of ways. We define BCF and PCF as revenues net of agency commissions and operating expenses.

(6) EBITDA before certain charges is defined as broadcast/publishing cash flow less corporate and international business development expenses. EBITDA before certain charges does not take into account our debt service requirements and other commitments and, accordingly, it is not necessarily indicative of amounts that may be available for dividends, reinvestment in our business or other discretionary uses. EBITDA before certain charges is not a measure of liquidity or of performance in accordance with generally accepted accounting principles, and should be viewed as a supplement to and not a substitute for our results of operations presented on the basis of generally accepted accounting principles. Moreover, EBITDA before certain charges is not a standardized measure and may be calculated in a number of ways.

(7) Capital expenditures for the years ended February 28, 1998 and 1999 and six months ended August 31, 1998 and 1999 include progress payments totaling $11,775, $30,029, $13,486 and $14,540, respectively, in connection with the construction of our new Indianapolis office and studio facility and new operating facilities at KHON-TV in Hawaii.

11

15

## RISK FACTORS

In connection with this offering, you should consider carefully all of the information in this prospectus and, in particular, the following factors:

OUR REVENUES ARE SUBSTANTIALLY DEPENDENT UPON THE DEMAND FOR ADVERTISING, WHICH FLUCTUATES WITH GENERAL ECONOMIC CONDITIONS THAT WE CANNOT CONTROL.

We derive substantially all of our revenues from the sale of advertising on our radio and television stations and in our magazines. Because advertisers generally reduce their spending during economic downturns, we could be adversely affected by a future national recession. In addition, because a substantial portion of our revenues are derived from local advertisers, our ability to generate advertising revenues in specific markets could be adversely affected by local or regional economic downturns. This is particularly true in New York, where our three radio stations accounted for approximately 25.4% of our net revenues for the six months ended August 31, 1999.

IF OUR STATIONS CANNOT KEEP OR INCREASE THEIR CURRENT AUDIENCE RATINGS OR MARKET SHARE, IT WOULD ADVERSELY AFFECT OUR CASH FLOW AND, CONSEQUENTLY, OUR ABILITY TO FUND OUR OPERATIONS.

The broadcasting industry is very competitive. The success of each of our stations is dependent upon its audience ratings and share of the overall advertising revenues within its market. Our stations compete for audiences and advertising revenues directly with other radio and television stations, and some of the owners of those competing stations have greater resources than we do. Although we believe that each of our stations can compete effectively in its broadcast area, we cannot be sure that any of our stations can keep or increase its current audience ratings or market share.

The quality and variety of our programming is a principal competitive factor. However, it is difficult to predict accurately how a program will perform because television stations often must purchase program rights two or three years in advance. In addition, because television stations need to contract for syndicated programming and develop original programming substantially in advance of the date it is first broadcast, the audience ratings and broadcast cash flow of our television stations generally does not improve as a result of the new programming for some time. Other stations may change their format or programming to compete directly with our stations for audience and advertisers, or engage in aggressive promotional campaigns. If this happens, the ratings and advertising revenues of our stations could decrease, the promotion and other expenses of our stations could increase, and our stations would have lower broadcast cash flow.

Our stations also compete with other media such as cable television, newspapers, magazines, direct mail, compact discs, music videos, the Internet and outdoor advertising. New media technologies are also being introduced to compete with the broadcasting industry. Some of these new technologies are as follows:

- Direct broadcast satellite systems, which provide video and audio programming on a subscription basis to people with a satellite signal receiving dish and decoder equipment. These systems claim to provide high picture and sound quality. They do not usually provide the signals of traditional over-the-air broadcast stations, although they sometimes

12

16

      provide network television stations to subscribers located outside the
coverage area of a local network station. New legislation may increase
the ability of direct broadcast satellite systems to provide the signals
to traditional stations, including both local and out-of-market network
stations.

- Digital audio broadcasting and satellite digital audio radio service,
  which provide for the delivery of multiple new, high quality audio
  programming formats to local and national audiences.

      In addition, the FCC requirement for television stations to begin
broadcasting digital signals by May 2002 may result in a greater number of
channels overall and lead to increased competition for licenses and programming.
We cannot predict at this time the effect, if any, that any of these new
technologies may have on the radio or television broadcasting industry in
general or our stations in particular.

IF OUR STRATEGY TO GROW THROUGH ACQUISITIONS IS LIMITED BY COMPETITION FOR
SUITABLE PROPERTIES OR OTHER FACTORS WE CANNOT CONTROL, IT COULD ADVERSELY
AFFECT OUR FUTURE RATE OF GROWTH.

      We intend to selectively pursue acquisitions of radio stations, television
stations and publishing properties as our management believes appropriate. In
order for us to be successful with this strategy, we must be effective at
quickly evaluating markets, obtaining financing to buy stations and publishing
properties on satisfactory terms and obtaining the necessary regulatory
approvals, including approvals of the FCC and the Department of Justice. We must
also do these tasks at reasonable costs. We compete with many other buyers for
television and radio stations and publishing properties. Many of those
competitors have much more money and other resources than we do. We cannot
predict whether we will be successful in buying stations or whether we will be
successful with any station we buy. Also, our strategy is generally to buy
underperforming broadcast and publishing properties and use our experience to
improve their performance. Thus, we will likely benefit over time from any
property we buy, rather than immediately, and we may need to pay large initial
costs for these improvements.

      Consummation of our pending acquisitions of television station WKCF in
Orlando, Florida and six radio stations and one television station in St. Louis,
Missouri is subject to numerous closing conditions, including in the case of the
St. Louis stations the receipt of required regulatory approvals. We can give no
assurance that any of these pending acquisitions will be consummated in a timely
manner or on the terms described in this prospectus, if at all.

WE ARE OBLIGATED TO PURCHASE SINCLAIR'S ST. LOUIS STATIONS, BUT THE ACTUAL
PURCHASE PRICE AND OTHER MATERIAL TERMS OF THE ACQUISITION HAVE NOT YET BEEN
DETERMINED. THE PURCHASE PRICE COULD BE HIGHER AND THE OTHER MATERIAL TERMS OF
THE ACQUISITION COULD BE LESS FAVORABLE THAN WE BELIEVE IS APPROPRIATE.

      Because the option on Sinclair's St. Louis stations has been exercised, and
we were designated as the purchaser, we believe we have a binding obligation to
buy the St. Louis stations and Sinclair has a binding obligation to sell them.
The option provides that the purchase price is to be the "fair market value" of
the stations and outlines an appraisal process for its determination. Because we
and Sinclair have been unable to agree on the fair market value of

13

17

the stations, the determination of the purchase price is likely to be made by independent appraisers.

The Sinclair option provides that the other terms of the final purchase agreement are to be "customary" for transactions of this type. Sinclair has proposed certain terms which we do not believe are consistent with this standard. If we and Sinclair do not agree on what is customary, the determination would likely be made by a court, which could significantly delay the transaction or result in transaction terms materially different than we now expect.

OUR SUBSTANTIAL INDEBTEDNESS COULD ADVERSELY AFFECT OUR FINANCIAL HEALTH.

We have now and, after the offering and the consummation of our pending acquisitions, will continue to have a significant amount of indebtedness. At August 31, 1999, our total indebtedness was approximately $636.6 million and our stockholders' equity was approximately $245.0 million. Our substantial indebtedness could have important consequences to you. For example, it could:

- increase our vulnerability to general adverse economic and industry conditions;

- limit our ability to finance future acquisitions;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- limit, along with the financial and other restrictive covenants in our credit facility and the indenture governing our subordinated notes, among other things, our ability to borrow additional funds. Failing to comply with those covenants could result in an event of default which, if not cured or waived, could have a material adverse effect on us.

In addition, at August 31, 1999, approximately 76.0% of our total assets consisted of intangible assets, such as broadcast licenses, excess of cost over fair value of net assets of purchased businesses, subscription lists and similar assets, the value of which depends significantly upon the continued operation of our business. As a consequence, in the event of a default or any other event which would result in a liquidation of our assets to pay our indebtedness, we cannot assure you that the proceeds would be sufficient to repay our outstanding indebtedness.

TO SERVICE OUR INDEBTEDNESS, WE WILL REQUIRE A SIGNIFICANT AMOUNT OF CASH. OUR ABILITY TO GENERATE CASH DEPENDS ON MANY FACTORS BEYOND OUR CONTROL.

Our ability to make payments on and to refinance our indebtedness and to fund planned capital expenditures will depend on our ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Based on our current level of operations and operating improvements, we believe our cash flow from operations, available cash and available borrowings under our credit facility will be adequate to meet our future liquidity needs for at least the next

14

18

few years. We cannot assure you, however, that our business will generate sufficient cash flow from operations, that currently anticipated operating improvements will be realized on schedule or that future borrowings will be available to us under our credit facility in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs. We may need to refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all.

ONE SHAREHOLDER CONTROLS A SUBSTANTIAL MAJORITY OF THE VOTING POWER OF THE COMMON STOCK, AND HIS INTERESTS MAY CONFLICT WITH YOURS.

As of August 31, 1999, our Chairman and Chief Executive Officer, Jeffrey H. Smulyan, held shares representing approximately 69.9% of the outstanding combined voting power of all classes of our common stock. Even after our concurrent offering of Class A Common Stock, including the sale of his shares, Mr. Smulyan will still hold shares representing approximately 62.5% of the outstanding combined voting power of all classes of our common stock. As a result of his voting power, Mr. Smulyan can control the outcome of most matters submitted to a vote of our shareholders, including the election of a majority of the directors. We cannot assure you that Mr. Smulyan's interest will always align with your interest as a holder of convertible preferred stock.

THE LOSS OF ONE OR MORE KEY EXECUTIVES OR ON-AIR TALENT COULD SERIOUSLY IMPAIR OUR ABILITY TO IMPLEMENT OUR STRATEGY.

Our business depends upon certain key employees, including Jeffrey H. Smulyan, our Chairman and Chief Executive Officer. We had an employment agreement with Mr. Smulyan which expired in February 1999. Although we currently are engaged in discussions regarding a new long-term employment agreement for Mr. Smulyan and expect to enter into such an agreement, we cannot predict when or if such an agreement will be completed and signed. In addition, we employ several on-air personalities with significant loyal audiences. We generally enter into long-term employment agreements with our key on-air talent, but we cannot be sure that any of these on-air personalities will remain with our company.

IF THE COST OF EQUIPPING OUR TELEVISION STATIONS WITH DIGITAL TELEVISION CAPABILITIES IS TOO GREAT, IT COULD ADVERSELY AFFECT OUR CASH FLOW AND, CONSEQUENTLY, OUR ABILITY TO FUND OUR OPERATIONS.

Under current rules of the Federal Communications Commission, our television stations will be required to broadcast a digital signal by May 2002 and then cease analog operations at the end of a digital television transition period. Digital television will provide additional channels to television broadcasters which can be used for multiple standard definition program channels, data transfer and other services as well as digital video programming. However, our costs to convert our television stations to digital television will be significant, and we cannot predict whether or when there will be any consumer demand for digital television services.

15

19

OUR NEED TO COMPLY WITH COMPREHENSIVE, COMPLEX AND SOMETIMES UNPREDICTABLE
FEDERAL REGULATIONS COULD HAVE AN ADVERSE EFFECT ON OUR BUSINESS.

The broadcasting industry in the United States is subject to extensive and
changing regulation by the Federal Communications Commission. Among other
things, the FCC is responsible for the following:

- Assigning frequency bands for broadcasting;

- Determining the particular frequencies, locations and operating power of
  stations;

- Issuing, renewing, revoking and modifying station licenses;

- Determining whether to approve changes in ownership or control of
  station licenses;

- Regulating equipment used by stations; and

- Adopting and implementing regulations and policies that directly affect
  the ownership, operation, programming and employment practices of
  stations.

The FCC has the power to impose penalties for violation of its rules or the
applicable statutes. In particular, our business will be dependent upon
continuing to hold broadcasting licenses from the FCC that are issued for terms
of up to eight years. While in the vast majority of cases these licenses are
renewed by the FCC, we cannot be sure that any of our United States stations'
licenses will be renewed at their expiration date. If our licenses are renewed,
we cannot be sure that the FCC will not impose conditions or qualifications that
could cause problems in our business. Although a recent amendment to the law
loosened or eliminated many restrictions on ownership of radio and television
stations in the United States, we are still restricted from owning more than a
certain number of stations in any United States market. This restriction, as
well as rules which could "attribute" ownership of broadcast properties by other
persons to us because those persons are associated with us, may limit our
ability to purchase stations we would otherwise wish to buy. The law also limits
the ability of non-U.S. persons to own our capital stock and to participate in
our affairs. Our articles of incorporation contain provisions which place
restrictions on the ownership, voting and transfer of our capital stock in
accordance with the law.

OUR CURRENT AND ANY FUTURE INTERNATIONAL OPERATIONS ARE SUBJECT TO CERTAIN RISKS
THAT ARE UNIQUE TO OPERATING IN A FOREIGN COUNTRY.

We currently own a 54% interest in a national radio station in Hungary, we
have entered into an agreement to purchase two radio stations in Argentina, and
we are pursuing and intend to continue to pursue opportunities to buy additional
broadcasting properties in Argentina and other foreign countries. The risks of
doing business in foreign countries include the following:

- Changing regulatory or taxation policies;

- Currency exchange risks;

- Changes in diplomatic relations or hostility from local populations;

- Seizure of our property by the government, or restrictions on our
  ability to transfer our property or earnings out of the foreign country;
  and

16

20

- Potential instability of foreign governments, which might result in losses against which we are not insured.

Although we will try to evaluate the risks before we purchase a station in a foreign country, we cannot be sure whether any of these risks will have an effect on our business in the future.

IF ONE OR MORE OF THE COMPUTER SYSTEMS UPON WHICH OUR BUSINESS DEPENDS FAILS TO OPERATE CORRECTLY AFTER JANUARY 1, 2000, OUR ABILITY TO BROADCAST, PUBLISH AND CONDUCT OUR BUSINESS OPERATIONS COULD BE IMPAIRED FOR A PERIOD OF TIME.

Our ability to conduct business depends upon information technology, broadcast and other equipment and imbedded technology. If this technology is not year 2000 compliant prior to January 1, 2000, we might not be able to broadcast, publish, or process business transactions at particular locations or throughout the company. Although we have completed our assessment phase of year 2000 compliance and all technology and equipment which has been identified as noncompliant is scheduled to be replaced before the end of 1999, we have necessarily relied upon the representations of our vendors as to the year 2000 compliance of products supplied by them. Moreover, the ability of third parties with whom we transact business to adequately address their year 2000 compliance issues is outside of our control. The failure of one or more of such third parties to adequately address their year 2000 compliance issues could interrupt our broadcasting and other activities and harm our business.

FLUCTUATIONS IN THE MARKET PRICE OF OUR CLASS A COMMON STOCK MAY MAKE IT MORE DIFFICULT FOR US TO RAISE CAPITAL.

The market price of our Class A Common Stock is extremely volatile and has fluctuated over a wide range. The fluctuations may impair our ability to raise capital by offering equity securities. The market price may continue to fluctuate significantly in response to various factors, including:

- market conditions in the industry;

- announcements or actions by competitors;

- low trading volume;

- sales of large amounts of our Class A Common Stock in the public market or the perception that such sales could occur;

- quarterly variations in operating results or growth rates;

- changes in estimates by securities analysts;

- regulatory and judicial actions; and

- general economic conditions.

FUTURE SALES OF COMMON STOCK COULD LOWER OUR STOCK PRICE.

Several stockholders own significant amounts of our common stock. If existing stockholders decide to sell large amounts of our stock, our stock price could fall. Even the market's perception

17

21

that this might occur could lower our stock price. In addition, concurrent with this offering, we intend to sell additional Class A Common Stock.

WE HAVE NOT PAID AND DO NOT INTEND TO PAY DIVIDENDS ON OUR COMMON STOCK, AND THEREFORE YOU MAY NOT REALIZE ANY BENEFIT OF CLASS A COMMON STOCK RECEIVED UPON CONVERSION OF YOUR CONVERTIBLE PREFERRED STOCK WITHOUT SELLING THE CLASS A COMMON STOCK.

We have never declared or paid any dividends on our common stock. In addition, under our credit facility, we are restricted in our ability to pay dividends on our common stock. We intend to retain any earnings to support the growth and development in our business, and we do not intend to pay cash dividends any time soon.

WE MAY ISSUE ADDITIONAL PREFERRED STOCK, WHICH COULD DILUTE YOUR INTERESTS OR DETER A CHANGE OF CONTROL OF EMMIS, EVEN IF THE CHANGE OF CONTROL IS FAVORED BY OUR SHAREHOLDERS.

Our articles of incorporation do not limit the issuance of additional series of preferred stock ranking ratably with or junior to the convertible preferred stock. Our articles of incorporation require approval by holders of two-thirds of the outstanding convertible preferred stock to issue any of our stock senior to the convertible preferred stock. The issuance of additional preferred stock on parity with the convertible preferred stock could dilute the interests of holders of the convertible preferred stock. None of the provisions relating to the convertible preferred stock affords the holders of the convertible preferred stock protection in the event of a highly leveraged or other transaction that might adversely affect their interests.

WE MAY REDEEM THE CONVERTIBLE PREFERRED STOCK ON OR AFTER APRIL 15, 2001.

We may redeem the convertible preferred stock on or after April 15, 2001, subject to certain conditions, including payment of additional amounts with respect to dividends, if the redemption occurs prior to October 15, 2002. You should assume that we will exercise our redemption option if it is in our interest to do so.

YOU WILL HAVE LIMITED VOTING RIGHTS.

As a holder of the convertible preferred stock, you will have voting rights only under certain limited conditions. If we fail to pay dividends to you for six or more consecutive quarterly periods, the holders of the convertible preferred stock (together with any other preferred shareholders who have the same voting rights) may elect two additional directors to serve on our board of directors. They will serve on the board only until all dividends in arrears and for the then current distribution period have been paid or set aside for payment.

OUR ABILITY TO PAY DIVIDENDS IS LIMITED BY INDIANA LAW.

Under Indiana law, we are not permitted to make a distribution to our shareholders, including dividends on our capital stock if, after giving effect to the payment we would not be able to pay our debts as they become due in the usual course of business or our total assets would be less than the sum of our total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed if we were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential

18

22

rights are superior to those receiving the distribution. Consequently, if we
fail to meet these criteria we will be unable to pay dividends on the
convertible preferred stock.

OUR EXISTING INDEBTEDNESS MAY LIMIT OUR ABILITY TO PAY CASH DIVIDENDS.

       Dividends on the preferred stock must be paid in cash. Under the indenture
for our subordinated notes, we may pay cash dividends and make other
distributions on or in respect of our preferred stock only if certain financial
tests are met. Under a proposed amendment to the credit facility, we will be
able pay cash dividends and make other distributions on or in respect of the
convertible preferred stock provided certain financial tests are met. There can
be no assurance that these financial tests will be met or that future financing
arrangements will permit us to pay cash dividends on the convertible preferred
stock.

THERE MAY BE NO ACTIVE OR LIQUID MARKET FOR THE CONVERTIBLE PREFERRED STOCK.

       There has been no trading market for the convertible preferred stock prior
to this offering. The underwriters have advised us that they intend to make a
market in the convertible preferred stock after the consummation of this
offering. However, they are not obligated to do so and may discontinue market
making activities at any time without notice. There can be no assurance,
therefore, that any market for the convertible preferred stock will develop or,
if one does develop, that it will be maintained. If an active trading market for
the convertible preferred stock fails to develop or be sustained, the trading
price of the convertible preferred stock could be materially adversely affected.
Even if actively traded, the convertible preferred stock may trade at a discount
from its initial offering price depending upon prevailing interest rates, the
market for similar securities, our performance and other factors.

OUR ANTICIPATED ACQUISITIONS MAY NOT BE COMPLETED AND, IF NOT COMPLETED, WE WILL
HAVE THE ABILITY TO APPLY SOME OF THE PROCEEDS OF THIS OFFERING TO FUND AS YET
UNIDENTIFIED ACQUISITIONS OR OTHER INVESTMENTS.

       If our anticipated acquisitions are not completed, a significant portion of
the net proceeds from this offering will not be designated for a specific use.
Therefore, we will have broad discretion with respect to the use of such
proceeds. Accordingly, our investors may not have the opportunity to evaluate
the economic, financial and other relevant information that we may consider in
the application of the net proceeds. This offering is not contingent or in any
way dependent on any anticipated acquisitions.

SOME OF OUR FORWARD-LOOKING STATEMENTS IN THIS PROSPECTUS MAY NOT TURN OUT TO BE
CORRECT.

       Some of the statements contained in this prospectus are forward-looking.
All statements regarding our expected financial position, business and financing
plans are forward-looking statements. These statements can sometimes be
identified by our use of forward-looking words such as "may," "will," "should,"
"expect," "anticipate," "estimate" or "continue." Although we believe that our
expectations in such forward-looking statements are reasonable, we cannot
promise that our expectations will turn out to be correct. Actual results could
be materially different from and worse than our expectations for various
reasons, including those discussed in this section.

23

## USE OF PROCEEDS

The net proceeds from the sale of our 6.25% Series A Cumulative Convertible Preferred Stock will be approximately $121 million, after deducting underwriting discounts and commissions and offering expenses (net proceeds would be approximately $139 million if the underwriters' over-allotment option were exercised in full). The net proceeds from our concurrent sale of 3,440,000 shares of Class A Common Stock will be approximately $205 million, after deducting underwriting discounts and commissions and offering expenses (net proceeds would be approximately $238 million if the underwriters' over-allotment option were exercised in full). We will not receive any proceeds from the concurrent sale of Class A Common Stock by the selling stockholder.

We intend to use the net proceeds received by us from the sale of convertible preferred stock under this prospectus, together with the net proceeds from our concurrent sale of Class A Common Stock, to fund the acquisition of additional broadcasting properties and acquisition-related expenses and for general corporate purposes. The broadcasting properties may include television station WKCF in Orlando, Florida and six radio stations and a television station in St. Louis, Missouri.

Pending these uses, we may use all or a portion of the net proceeds to partially repay amounts outstanding on our credit facility. Borrowings under our credit facility bear interest at a rate that fluctuates with an applicable margin based on our leverage ratio plus a bank base rate or a Eurodollar base rate as applicable. At August 31, 1999, the weighted average interest rate on our credit facility was approximately 7.5% and the principal amount outstanding was approximately $319 million. The revolving portion of our credit facility matures on August 31, 2006 and the term portion matures on February 28, 2007.

20

24

PRICE RANGE OF CLASS A COMMON STOCK

Our Class A Common Stock is traded on the Nasdaq National Market under the symbol EMMS. The following table sets forth the high and low sale prices of the Class A Common Stock for the periods indicated.

|  | PRICES PER SHARE | |
| --- | --- | --- |
|  | HIGH | LOW |
| FISCAL YEAR ENDED FEBRUARY 28, 1998 | | |
| First Quarter | $39.50 | $31.00 |
| Second Quarter | 51.00 | 36.25 |
| Third Quarter | 49.75 | 43.00 |
| Fourth Quarter | 49.75 | 43.75 |
| FISCAL YEAR ENDED FEBRUARY 28, 1999 | | |
| First Quarter | 57.13 | 41.50 |
| Second Quarter | 49.13 | 36.50 |
| Third Quarter | 39.50 | 22.13 |
| Fourth Quarter | 51.88 | 33.88 |
| FISCAL YEAR ENDED FEBRUARY 29, 2000 | | |
| First Quarter | 50.25 | 39.00 |
| Second Quarter | 59.13 | 44.00 |
| Third Quarter (through October 26, 1999) | 69.50 | 54.50 |

The last reported sale price of our Class A Common Stock on the Nasdaq National Market on October 26, 1999 was $62.50 per share. As of October 25, 1999, we had 1,720 registered holders of Class A Common Stock.

DIVIDEND POLICY

We have followed a policy of retaining our earnings for use in our business rather than paying any dividends on our common stock. In addition, under our credit facility, we are restricted in our ability to pay dividends on our common stock. Accordingly, we have not paid dividends and do not anticipate paying any dividends on shares of our common stock in the foreseeable future.

21

25

## CAPITALIZATION

The following table sets forth our capitalization as of August 31, 1999 on an actual basis, as adjusted to give effect to this offering and as further adjusted to give effect to this offering and the concurrent Class A Common Stock offering. The table reflects a temporary repayment of the revolving portion of our credit facility pending consummation of pending acquisitions and assumes no exercise of the underwriters' over-allotment option. You should read this information together with our consolidated financial statements and related notes, which are included in and incorporated by reference in this prospectus.

| | AS OF AUGUST 31, 1999 | | |
| --- | --- | --- | --- |
| | ACTUAL | AS ADJUSTED (IN THOUSANDS) | AS FURTHER ADJUSTED |
| Cash............................................. | $ 3,061 | $ 54,674 | $ 260,136 |
| | ======== | ========== | ========== |
| Long-term debt, including current maturities: | | | |
| Credit facility................................ | $319,000 | $ 250,000 | $ 250,000 |
| Capital leases................................. | 827 | 827 | 827 |
| Hungarian radio debt(1)........................ | 16,754 | 16,754 | 16,754 |
| 8 1/8% Senior Subordinated Notes due 2009...... | 300,000 | 300,000 | 300,000 |
| | -------- | ---------- | ---------- |
| Total long-term debt........................ | 636,581 | 567,581 | 567,581 |
| | -------- | ---------- | ---------- |
| Shareholders' equity: | | | |
| 6.25% Series A Cumulative Convertible Preferred Stock, $.01 par value; as adjusted, 2,500,000 shares authorized, issued and outstanding................................... | -- | 25 | 25 |
| Class A Common Stock, $.01 par value; 34,000,000 shares authorized; as further adjusted for common stock offering, 17,051,821 shares issued and outstanding(2)............................... | 134 | 134 | 171 |
| Class B Common Stock, $.01 par value; 6,000,000 shares authorized; as further adjusted for common stock offering, 2,382,125 shares issued and outstanding(2).................... | 26 | 26 | 24 |
| Additional paid-in capital..................... | 269,241 | 389,829 | 595,256 |
| Accumulated deficit............................ | (22,848) | (22,848) | (22,848) |
| Accumulated other comprehensive income......... | (1,504) | (1,504) | (1,504) |
| | -------- | ---------- | ---------- |
| Total shareholders' equity.................. | 245,049 | 365,662 | 571,124 |
| | -------- | ---------- | ---------- |
| Total capitalization.................... | $881,630 | $ 933,243 | $1,138,705 |
| | ======== | ========== | ========== |

------------------------------

(1) Hungarian radio debt represents obligations of our 54% owned Hungarian subsidiary which are consolidated in our financial statements due to our majority ownership interest. However, we are not a guarantor of or required to fund these obligations.

(2) Does not include the 1,254,949 shares of Class A Common Stock and the 500,000 shares of Class B Common Stock issuable upon exercise of stock options outstanding as of August 31, 1999.

26

RECENT DEVELOPMENTS

ORLANDO ACQUISITION

Consistent with our acquisition strategy, effective June 3, 1999, we entered into a definitive agreement to purchase substantially all of the assets of television station WKCF in Orlando, Florida, for approximately $191.5 million in cash. The station's designated market area, as estimated by the A.C. Nielsen Company as of January 1999, is ranked 22 out of the 210 generally recognized designated market areas as defined by Nielsen and is projected to be one of the top five fastest growing markets in terms of retail sales and population in the nation's largest 25 markets.

WKCF is an affiliate of the WB television network. Like the Fox television network, WB targets a younger audience and provides us with a higher degree of programming flexibility than is available with the three traditional networks. For the 1998-1999 television season, the WB television network had the highest growth rate among television networks in the United States in terms of household viewership and was again the number one network among teens. As part of our acquisition of WKCF, we will assume and amend the affiliation agreement with WB so that it will terminate in December 2009, subject to earlier termination as defined in the agreement. Pursuant to the amended WB affiliation agreement, WB is to provide WKCF with programming in return for the station's broadcasting of WB-inserted commercials in that programming. WKCF also retains the right to include a limited amount of commercials during WB programming.

The FCC approved the acquisition on September 27, 1999. We expect the transaction to close during our fiscal quarter ending November 30, 1999.

ST. LOUIS ACQUISITION

In June 1999, we entered into an agreement with a former executive of Sinclair Broadcast Group, Inc., to purchase his right to acquire six radio stations and one television station in St. Louis from Sinclair. The executive's employment agreement with Sinclair gave him an option to purchase these stations at fair market value, and specifically provided that he could purchase the stations himself or designate a third party to purchase them. After signing the agreement with us, the executive exercised his option and designated us as the purchaser.

The option outlines an appraisal procedure to determine the fair market value of the stations, sets the standard for determining the terms of a definitive purchase agreement and includes a mechanism for establishing the closing date. The option also recognizes that many details of the acquisition are not specified in the agreement and requires that the parties work together in good faith. Although both we and Sinclair have an obligation to comply with the process and standard provided in the option to effect our purchase of the St. Louis stations, the duration of the process is uncertain and specific terms of the acquisition have not yet been determined. Until the process results in a determination of the material terms, the acquisition is not probable for financial reporting purposes.

St. Louis is the nineteenth ranked radio market by revenue size among all radio markets in the United States, according to BIA's Third Edition of the 1999 Radio Market Report. Sinclair's St. Louis properties complement our existing radio stations in the St. Louis market and should allow us to realize greater operating efficiencies. The following table sets forth certain

23

27

information regarding the St. Louis radio stations covered by the St. Louis option. In the table, "Ranking in Primary Demographic Target" is the ranking of the station among all radio stations in the St. Louis market based on the Spring 1999 Arbitron Survey. A "t" indicates the station tied with another station for the stated ranking. "Station Audience Share" represents a percentage generally computed by dividing the average number of persons over age 12 listening to a particular station during specified time periods by the average number of such persons for all stations in the market area as determined by Arbitron.

| STATION | FORMAT | PRIMARY DEMOGRAPHIC TARGET AGES | RANKING IN PRIMARY DEMOGRAPHIC TARGET | STATION AUDIENCE SHARE |
|---------|--------|-------------|-------------|-------|
| WIL-FM | Country | 25-54 | 3 | 7.1 |
| KIHT-FM | Classic Hits | 25-54 | 7t | 3.3 |
| KPNT-FM | Alternative Rock | 18-34 | 6t | 3.1 |
| KXOK-FM | Classic Rock | 25-54 | 10 | 2.9 |
| WVRV-FM | Modern Adult Contemporary | 25-54 | 11t | 2.9 |
| WRTH-AM | Adult Standards | 35-54 | 21 | 2.4 |

Under FCC regulations, we can own no more than six radio stations in the St. Louis market (of which no more than five may be FM stations) in combination with a television station in that market. As we already own three FM stations in the St. Louis market, concurrent with the acquisition of the above stations we must divest three FM stations. We intend to divest the stations with the three weakest transmitting signals.

The St. Louis television station, KDNL-TV, transmits on channel 30. The station's designated market area, as estimated by the A.C. Nielsen Company as of January 1999, is ranked 21 out of the 210 generally recognized designated market areas as defined by Nielsen. KDNL-TV is one of six television stations designated by Nielsen as "local" to the St. Louis market area. KDNL-TV ranks number five out of these six stations based on the rating as reported by Nielsen from 9:00 a.m. to midnight, Sunday through Saturday, during May 1999. The same Nielsen report indicates that the station has an audience share of nine, reflecting an estimate of the percentage of households in the St. Louis designated market area viewing KDNL-TV in comparison to other local commercial stations in the market as measured from 9:00 a.m. to midnight, Sunday through Saturday. KDNL-TV is an ABC affiliate; however, we have not yet discussed with ABC what effect, if any, our purchase of KDNL-TV will have on the station's affiliation agreement.

ARGENTINA ACQUISITIONS

We have signed an agreement to purchase one FM radio station and one AM radio station in Buenos Aires, Argentina. We are also discussing an additional potential acquisition of radio broadcast properties in Argentina and are in the process of negotiating the terms and conditions of a definitive purchase agreement. Consistent with our international acquisition strategy, we are pursuing local minority-interest partners for these investments. We expect that these acquisitions would have an aggregate purchase price of approximately $25 million.

24